[No. B228209. Second Dist., Div. One. Dec. 5, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
IZAC McCLOUD, Defendant and Appellant.

[No. B229841. Second Dist., Div. One. Dec. 5, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
JONZEL STRINGER, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II.B. and III. through XI. of the Discussion.

**COUNSEL**

Chris R. Redburn, under appointment by the Court of Appeal, for Defendant and Appellant Izac McCloud.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant Jonzel Stringer.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Steven D. Matthews and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ROTHSCHILD, J.**—Defendants Izac McCloud and Jonzel Stringer fired 10 shots from a semiautomatic handgun at a party at which over 400 people

were present. Three bullets struck three victims, killing two and injuring the third. The seven remaining bullets hit no one.

McCloud and Stringer were charged by grand jury indictment with two counts of murder and 60 counts of attempted murder, 14 of which were later dismissed. Defendants were tried together but before separate juries, which convicted both defendants of second degree murder for the two deaths, convicted Stringer of all 46 counts of attempted murder, and convicted McCloud of 46 counts of the lesser included offense of assault with a firearm.

In the published portion of our opinion, we conclude that the trial court prejudicially erred by instructing the jury on the "kill zone" theory of attempted murder. The record contains no evidence to support application of the kill zone theory.

Also in the published portion of our opinion, we conclude that the evidence is insufficient to sustain 46 attempted murder convictions. Rather, the evidence is sufficient to support only eight attempted murder convictions.

Defendants also raise a number of other issues, which we address in the nonpublished portion of our opinion; we conclude that most of them lack merit. We accordingly reverse in part, affirm in part, and remand for further proceedings.

## BACKGROUND

### A. *Procedural Summary*

The grand jury indictment charged McCloud and Stringer with the murders of Breon Taylor (count 1) and Dennis Moses (count 2), in violation of Penal Code section 187.[1] It further charged McCloud and Stringer with the attempted willful, deliberate, and premeditated murders of Ryan Gaines (count 3) and 59 other named victims (counts 4 through 62), in violation of sections 187 and 664. The indictment also alleged as to each count that a principal was armed within the meaning of section 12022, subdivision (a)(1), and that McCloud personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm causing great bodily injury or death within the meaning of section 12022.53, subdivisions (b), (c), and (d). In addition, as to counts 1 and 2, the indictment alleged the special circumstance of multiple murder within the meaning of section 190.2, subdivision (a)(3), and as to count 3 it alleged that McCloud inflicted great bodily injury within the meaning of section 12022.7, subdivision (a).

---

[1] All subsequent statutory references are to the Penal Code unless otherwise indicated.

McCloud and Stringer pled not guilty and denied the allegations. On motion of the prosecution, the court dismissed 12 of the attempted murder counts (counts 7, 18, 19, 20, 22, 23, 37, 39, 44, 45, 53, and 61) pursuant to section 1385, and the court later dismissed two additional counts of attempted murder (counts 13 and 58) pursuant to section 1118.1.

The charges against both defendants were tried together but to separate juries. Jury selection (starting with the Stringer panel) began on July 12, 2010. The McCloud panel began deliberations on September 9, 2010, and returned its verdict September 16, 2010. The Stringer panel began deliberations on September 13, 2010, and returned its verdict on September 21, 2010.

McCloud's jury found him not guilty of first degree murder but guilty of second degree murder on counts 1 and 2. The jury also found McCloud not guilty of attempted murder but guilty of assault with a firearm (a lesser included offense) on the remaining 46 counts. As to counts 1 and 2, the jury found true all of the personal use of a firearm allegations under section 12022.53, and as to each of the remaining counts, the jury found true the allegation that McCloud personally used a firearm within the meaning of section 12022.5, subdivision (a).

Stringer's jury deadlocked on first degree murder as to counts 1 and 2, so the prosecution elected not to pursue first degree murder convictions on those counts. After the court instructed the jury to that effect, the jury found Stringer guilty of second degree murder on counts 1 and 2 and guilty of attempted murder on the remaining 46 counts. The jury also found true the principal armed allegation as to all counts, but, as to each attempted murder count, the jury found not true the allegation that the attempted murder was willful, deliberate, and premeditated.

The court sentenced McCloud to 202 years to life in state prison, calculated as follows: 15 years to life as to count 1, plus 25 years to life for the firearm allegation as to that count; plus an identical sentence as to count 2; plus the upper term of four years as to count 3, plus three years for the great bodily injury allegation, plus 10 years for the personal use of a firearm allegation under section 12022.5, subdivision (a); plus one-third of the midterm of three years, plus 16 months for the personal use of a firearm allegation under section 12022.5, subdivision (a), as to each of the remaining 45 counts, with all sentences to run consecutively. The court also imposed various statutory fines and fees.

The court sentenced Stringer to 198 years to life in state prison, calculated as follows: 15 years to life as to count 1, plus three years for the principal armed allegation as to that count; plus an identical sentence as to count 2;

plus the upper term of nine years as to count 3, plus three years for the principal armed allegation as to that count; plus 28 months (one-third of the midterm of 84 months), plus 12 months for the principal armed allegation, for each of the remaining 45 counts, with all sentences to run consecutively. The court also imposed various statutory fines and fees.

Both defendants timely appealed. We hereby order the appeals consolidated.

### B. *The Shooting*

The tragic events underlying the charges took place on January 19, 2008, at a Masonic Lodge in Lakewood, at the 18th birthday party of twin brothers Randall and Carlton Hook. The Hook twins were founding members of an anti-gang social group called the "Acrites" (derived from the words "act right"), whose origins Randall Hook described as follows: "My friends and I started it because we chose—we specifically chose that term because there was and still is the misconception that inner city youth, especially African-American adolescents from Compton in particular—that we are troublemakers. So we wanted to counter that idea[]. And so we started the group to show that we could be from Compton, but we didn't necessarily have to be bad kids."

The Hook family took numerous steps to promote safety and avoid trouble at the party: They held the party at a Masonic Lodge next to a church, hired security guards, served no alcohol, and charged $10 for admission as a means of screening and controlling the flow of guests.

The party was well attended, with hundreds of people packed "elbow to elbow" inside and many more in line in the parking lot, waiting to enter.[2] Lewis Hook, the twins' father, eventually concluded that the party had gotten too large and "was not a controllable situation," and he decided "to shut the party down." As he was on his way to announce that the party was over, gunshots rang out, a window shattered, and the shooting continued as frantic partygoers attempted to flee.

Police responding to the scene found three victims who had been shot while inside the lodge. Dennis Moses was killed by a single shot to the head. Breon Taylor was killed by a single shot to the head as well. Ryan Gaines was shot once in the leg.

---

[2] Witnesses' estimates of the number of people inside and outside varied, but all agreed the numbers were large. Police responding to the scene after the shootings collected names and contact information from 428 individuals.

Investigating officers found 10 nine-millimeter shell casings outside in the parking lot but found no evidence of shots having been fired inside the lodge. After examining the casings, the police criminalist determined that they were all fired from the same weapon. He testified that the "most common" magazine size for a nine-millimeter handgun is "ten cartridges per magazine," though he acknowledged that higher capacity magazines exist. The lead investigating officer likewise testified that "the public is allowed to buy up to . . . a magazine that holds ten," which is "commonly available to the public," but "[l]aw enforcement can buy a larger capacity magazine."

The criminalist concluded that the bullets recovered from Moses, Taylor, and Gaines were all fired from a nine-millimeter semiautomatic firearm, and that the bullets recovered from Moses and Taylor were fired from the same firearm. The bullet recovered from Gaines was too damaged for the weapon to be as conclusively identified, but the criminalist testified that "more likely than not" it was fired from the same firearm as the bullets recovered from Moses and Taylor. The criminalist also discovered "pitting" and the presence of a "glistening powdery substance" on the surface of the bullets recovered from the bodies of Moses, Taylor, and Gaines, and he concluded on that basis that those three bullets had passed through glass before striking the victims. Investigating officers identified five bullet strike marks on the exterior wall of the lodge near the broken window and two bullet holes in a car in the parking lot. All 10 bullets from the 10 casings were thus accounted for: two struck the car, five struck the wall, and three passed through the window and struck and lodged in Moses, Taylor, and Gaines. The gun itself was never found.

## C. *The Identification Evidence*

Peter Adams was the only eyewitness who claimed to have seen Stringer at the party and to have seen McCloud fire the gun outside.[3] When contacted by police immediately after the shooting, Adams said that he did not know or see anything. On the Monday after the shooting, however, Adams told Marcus Egland, a gang intervention specialist at Adams's high school, that he (Adams) "was there when everything happened" and "not only did he see the actual shooting, but he knows who did the shooting." In talking to Egland, Adams referred to Stringer as "JP," but additional information Adams gave to Egland enabled Egland to determine that "JP" was Stringer. Egland testified that Adams told him that he saw McCloud and Stringer become upset after being unable to get into the party, and that Stringer told McCloud "to go to

---

[3] Another witness, Dominique Smith, testified that she saw McCloud pull out a gun during a confrontation inside the party, and that seconds later she heard gunshots and saw muzzle flash from the gun. The police, however, found no physical evidence that any gun was fired inside the party. The lead investigating officer concluded that all shots were fired from outside; that was the only theory argued by the prosecution.

the car and get the gun out and end it," i.e., "[e]nd the party." According to Egland, Adams told him that Stringer "instructed" McCloud to "shoot it up in the air. Just scare 'em." Adams saw McCloud shooting into the party, and Adams was standing sufficiently close that he felt his own life was in danger.

Adams's statements in subsequent interviews with the police were not all consistent, and he admitted having given incorrect information to the police at various times. In a taped interview on February 4, 2008, he told police a version of events that was largely the same as the one he had told to Egland: There was some sort of fight at the party; a companion of McCloud's told McCloud to "[e]nd the party" and "shoot it in the air"; and McCloud retrieved the gun from the car and shot at the party. In his trial testimony, Adams answered "I don't remember" to nearly every question asked, and he specifically denied having told the police who the shooter was. The recording of the February 4, 2008, interview, however, in which Adams told the police that McCloud shot at the party after having been told to "[e]nd the party" and "shoot it in the air," was played for the jury.

Letwan Lucky testified that he had known McCloud for about seven years at the time of the shooting. McCloud sometimes came over to Lucky's house with other friends, including Stringer, whom Lucky knew only as "JP."

In the early afternoon on the day of the shooting, McCloud, Stringer, and another friend named Karon Lofton were at Lucky's house when another individual, known to Lucky only as "Black-T," arrived. Black-T brought with him a semiautomatic handgun, which appeared to Lucky to be "a 9, similar to a Glock." Upon seeing the gun, Stringer and McCloud said they could use it for "protection" at a party they were going to that night in Lakewood. Stringer and McCloud asked Black-T if they could use the gun, and he said they could. Stringer told McCloud to get the gun from Black-T, and McCloud agreed. McCloud, Stringer, Lofton, and Black-T then said they were going home to get dressed for the party and walked out of Lucky's garage into the alley. McCloud and Black-T went in one direction, and Stringer and Lofton in another.

Lucky did not see McCloud again that day, but Stringer returned to Lucky's house later that evening. (Lucky's testimony concerning that encounter with Stringer was presented to Stringer's jury only.) According to Lucky, Stringer seemed "nervous" and "scared" and kept walking in circles and saying "I didn't do it." Once Stringer calmed down, he said that he and McCloud drove to the party, Stringer "walked up to the door to go in, and they socked him in the face," he ran back to the car "hollering 'get 'em,' " got the gun from McCloud, fired two shots, and then handed the gun back to McCloud, who fired six more shots. Stringer and McCloud then got back into the car, and Stringer drove them away from the scene.

Lucky also testified that he spoke with McCloud several days after the party. (Lucky's testimony concerning that conversation with McCloud was presented to McCloud's jury only.) McCloud told Lucky that at the party in Lakewood, Stringer "came running out" after "somebody socked him two times." Stringer said "get 'em," and McCloud fired "[a]bout five or six" shots at the party. Stringer then drove them away. McCloud later sold the gun.

## DISCUSSION

### I. *The Kill Zone Theory*

Stringer objected in the trial court to the prosecution's request that the jury be instructed on the kill zone theory of liability for attempted murder. On appeal, he argues that the trial court committed prejudicial error by instructing the jury on the kill zone theory.[4] We agree.

### A. *Instructional Error*

" 'The trial court has the duty to instruct on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." [Citation.] "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference [citation]." [Citation.]' (*People v. Saddler* (1979) 24 Cal.3d 671, 681 [156 Cal.Rptr. 871, 597 P.2d 130].)" (*People v. Alexander* (2010) 49 Cal.4th 846, 920–921 [113 Cal.Rptr.3d 190, 235 P.3d 873].) Accordingly, if the record contains no evidence that would support application of the kill zone theory in this case, then the trial court erred by instructing the jury on that theory.

■ " 'The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. (*People v. Lasko* (2000) 23 Cal.4th 101, 107 [96 Cal.Rptr.2d 441, 999 P.2d 666].)' (*People v. Bland* (2002) 28 Cal.4th 313, 327 [121 Cal.Rptr.2d 546, 48 P.3d 1107] (*Bland*).) In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' (*People v. Lee* (2003) 31 Cal.4th 613, 623 [3 Cal.Rptr.3d

---

[4] On appeal, McCloud and Stringer join in each other's arguments to the extent they are beneficial. Because the kill zone theory is only a theory of liability for attempted murder and McCloud was found not guilty on all counts of attempted murder, the kill zone issue relates only to Stringer's appeal.

402, 74 P.3d 176]; see *People v. Swain* (1996) 12 Cal.4th 593, 604–605 [49 Cal.Rptr.2d 390, 909 P.2d 994].)" (*People v. Smith* (2005) 37 Cal.4th 733, 739 [37 Cal.Rptr.3d 163, 124 P.3d 730] (*Smith*).)

"Under the classic formulation of California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and [kills] a bystander instead is subject to the same criminal liability that would have been imposed had ' "the fatal blow reached the person for whom intended." ' (*People v. Suesser* (1904) 142 Cal. 354, 366 [75 P. 1093] . . . .) In such a factual setting, the defendant is deemed as culpable as if he had accomplished what he set out to do." (*People v. Scott* (1996) 14 Cal.4th 544, 546 [59 Cal.Rptr.2d 178, 927 P.2d 288].)

Although transferred intent can support murder convictions if nontargeted individuals are killed, transferred intent *cannot* support *attempted* murder convictions concerning nontargeted individuals who were not killed. "[I]ntent to kill does not transfer to victims who are not killed, and thus 'transferred intent' cannot serve as a basis for a finding of attempted murder. (*Bland, supra*, 28 Cal.4th at pp. 326–331.)" (*People v. Perez* (2010) 50 Cal.4th 222, 232 [112 Cal.Rptr.3d 310, 234 P.3d 557] (*Perez*).) Thus, "[s]omeone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder—due to transferred intent—if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*People v. Bland, supra*, 28 Cal.4th at p. 328 (*Bland*).)

■ Nonetheless, the kill zone theory, first approved by the Supreme Court in *Bland*, yields a way in which a defendant can be guilty of the attempted murder of victims who were not the defendant's "primary target." (*Bland, supra*, 28 Cal.4th at p. 330.) Under *Bland*, "a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force *designed and intended to kill everyone in an area around the targeted victim* (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm." (*Smith, supra*, 37 Cal.4th at pp. 745–746, italics added.) Examples include "using an explosive device with intent to kill *everyone* in the area of the blast, or spraying a crowd with automatic weapon fire, a means likewise calculated to kill *everyone* fired upon." (*Perez, supra*, 50 Cal.4th at p. 232, italics added.)

■ The kill zone theory thus does *not* apply if the evidence shows only that the defendant intended to kill a particular targeted individual but attacked that individual in a manner that subjected other nearby individuals to a risk of fatal injury. Nor does the kill zone theory apply if the evidence merely shows, in addition, that the defendant was aware of the lethal risk to the nontargeted individuals and did not care whether they were killed in the course of the attack on the targeted individual. Rather, the kill zone theory applies only if the evidence shows that the defendant tried to kill the targeted individual *by killing everyone in the area in which the targeted individual was located*. The defendant in a kill zone case chooses to kill *everyone* in a particular area as a means of killing a targeted individual within that area. In effect, the defendant reasons that he cannot miss his intended target if he kills *everyone* in the area in which the target is located.

The kill zone theory consequently does not operate as an exception to the mental state requirement for attempted murder or as a means of somehow bypassing that requirement. In a kill zone case, the defendant does not merely subject everyone in the kill zone to lethal risk. Rather, the defendant *specifically intends* that *everyone* in the kill zone die. If some of those individuals manage to survive the attack, then the defendant—having specifically intended to kill every single one of them and having committed a direct but ineffectual act toward accomplishing that result—can be convicted of their attempted murder.

■ Two further features of the law of attempted murder are relevant to our analysis. First, in *People v. Stone* (2009) 46 Cal.4th 131 [92 Cal.Rptr.3d 362, 205 P.3d 272] (*Stone*), the Supreme Court held that "a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person." (46 Cal.4th at p. 140.) In *Stone*, the defendant fired a single shot at a group of approximately 10 people and was charged with the attempted murder of Joel F., one of the people in the group. (*Id.* at pp. 135–136.) The prosecutor conceded at trial, however, that "he had not proven that defendant intended specifically to kill Joel F. rather than *someone* in the group of 10 persons." (*Id.* at p. 139.) The Supreme Court held that the prosecutor's concession did not preclude a conviction of attempted murder. (*Id.* at p. 140.) (The court also noted that the charging document's allegation that Joel F. was the intended victim was "problematic" because of the lack of evidence that the defendant had targeted any specific person, so "it would no doubt have been better had the case been charged differently," without naming "a specific victim." (*Id.* at pp. 140–141.)) That is, the defendant could be convicted of attempted murder as long as he intended to kill *someone*, even if there was no *particular* person he intended to kill. In addition, the discussion in *Stone* makes clear that *multiple* attempted murder convictions can be supported by the same reasoning—a defendant can be

convicted of several attempted murders if he intended to kill several people, even if there were no particular people he intended to kill. (*Id.* at p. 140 ["a terrorist who simply wants to kill as many people as possible, and does not know or care who the victims will be, can be just as guilty of attempted murder"].)

Second, in *Perez* the defendant "fired a single bullet at a distance of 60 feet, from a car going 10 to 15 miles per hour, at a group of seven peace officers and a civilian who were standing less than 15 feet apart . . . . The bullet hit one officer in the hand, nearly severing his finger, but killed no one." (*Perez, supra,* 50 Cal.4th at p. 224.) The defendant was convicted of eight counts of attempted murder, but the Supreme Court reversed seven of the convictions, concluding that "the evidence is sufficient to sustain only a single count of premeditated attempted murder of a peace officer." (*Id.* at p. 225.) The court reasoned that "there is no evidence that defendant knew or specifically targeted any particular individual or individuals in the group of officers he fired upon. Nor is there evidence that he specifically intended to kill two or more persons with the single shot. Finally, there is no evidence defendant specifically intended to kill two or more persons in the group but was only thwarted from firing off the required additional shots by circumstances beyond his control. Without more, this record will not support conviction of eight counts of premeditated attempted murder." (*Id.* at pp. 230–231, fns. omitted.)

We now turn to the facts of this case. On appeal, respondent attempts to defend the giving of the kill zone instruction by arguing that when Stringer and McCloud shot the 10 bullets at the party, their primary target was the person who had punched Stringer. According to respondent, Stringer and McCloud "retrieved their handgun and fired a flurry of bullets—each of the ten rounds their semi-automatic handgun contained—at the person inside the Masonic Lodge who had punched [Stringer] moments earlier, thereby creating a kill zone. Thus, this is not a case . . . where [Stringer] and McCloud did not target a specific individual. . . . Instead, the jury could have reasonably concluded that they acted with the specific intent to kill the person who punched [Stringer] in the face, with the concurrent intent to kill the people standing nearby. Such facts support the 'kill zone' theory of liability presented to the jury."

■ We disagree. In order for the kill zone theory to support 46 attempted murder convictions in the manner suggested by respondent, the record would have to contain evidence that Stringer and McCloud tried to kill the person who punched Stringer by killing all 46 people in the area where Stringer's assailant was located. But the record contains no evidence that Stringer or McCloud intended to kill 46 people with 10 bullets. Nor does the record

contain evidence that it would have been possible for them to kill 46 people with 10 bullets (given the type of ammunition and firearm they used), or that they believed or had reason to believe it was possible.[5] On the contrary, the evidence tended to show that it was not possible—of the three bullets that struck Moses, Taylor, and Gaines, all three lodged in their bodies rather than exiting. As in *Perez*, there is no evidence that Stringer and McCloud "specifically intended to kill two or more persons with [a] single shot" (*Perez, supra*, 50 Cal.4th at p. 231), much less that they specifically intended to kill the 4.6 people per shot that would be necessary to support respondent's application of the kill zone theory.

Respondent attempts to fill this gap in the evidence by referring to the extremely crowded conditions at the party, where hundreds of people were present. According to respondent, "[g]iven the number of guests at the party, it is clear that there were dozens upon dozens of victims in the direct line of fire when [Stringer and McCloud] unloaded their semi-automatic handgun into the Masonic Lodge. As in [*Smith*], the presence of these victims packed 'elbow to elbow' gave [Stringer and] McCloud the ability to kill multiple victims with one shot. Accordingly, sufficient evidence was presented in support of a 'kill zone' theory of liability as to the 46 counts of attempted murder." The argument relies heavily upon *Smith*, a case in which the Supreme Court affirmed two attempted murder convictions arising from a single gunshot fired in the direction of a car's driver from a few feet behind the car, when the driver's son was in an infant car seat directly behind the driver's seat. (*Smith, supra*, 37 Cal.4th at pp. 736–738.) The court concluded that the evidence was sufficient to "support an inference that [the defendant] acted with intent to kill both" the driver and the son. (*Id.* at p. 743.)

Again, we find respondent's argument unpersuasive. Here, as in *Perez*, "the evidence is insufficient to establish that defendant[s] acted with the intent to kill two or more individuals" per shot fired. (*Perez, supra*, 50 Cal.4th at p. 233.) The evidence that there were "dozens upon dozens" of people,

---

[5] In contrast, in *People v. Vang* (2001) 87 Cal.App.4th 554 [104 Cal.Rptr.2d 704], the defendants sprayed numerous bullets from a "high-powered assault rifle" and fired multiple shells from a shotgun at a duplex unit and an apartment. (*Id.* at p. 558.) Twenty-one shell casings and five shotgun shells were found at the duplex, the front of which was dotted with at least 50 bullet holes, and there was "extensive gunfire damage throughout each unit's interior." (*Ibid.*) The defendants were convicted of the attempted murder of the nine people who had been inside the residences but had survived the attack. (*Id.* at pp. 556–558.) The Court of Appeal held that the evidence was sufficient to sustain those attempted murder convictions, because "[t]he jury drew a reasonable inference, in light of the placement of the shots, the number of shots, *and the use of high-powered, wall-piercing weapons*, that defendants harbored a specific intent to kill every living being within the residences they shot up." (*Id.* at pp. 563–564, italics added.) *People v. Vang* preceded *Bland*, but *Bland* cited it with approval and characterized it as a kill zone case "even though [it did] not employ that term." (*Bland, supra*, 28 Cal.4th at p. 330.)

densely packed together, in the path of the bullets does constitute evidence that those people's lives were endangered. It does not, however, constitute evidence that Stringer and McCloud intended to kill more than one person per bullet fired, let alone that they intended to kill *more than four* people per bullet fired. The evidence of the size and density of the crowd therefore does not constitute evidence that Stringer and McCloud intended to kill 46 people with 10 bullets, so it cannot support respondent's application of the kill zone theory in this case.

In closing argument at trial, the prosecution attempted to support the 46 counts of attempted murder by arguing that the 46 named victims were grouped into three kill zones: one around Moses, one around Taylor, and one in the parking lot, near the car that was hit by two bullets. According to the prosecutor, "[t]he kill zone says that anyone who is in the line of fire, anyone who could have potentially been hit is a victim of that attempted murder. And one of the instructions that the judge read to you is that a person who intends to kill can be guilty of attempted murder, even if the person has no specific target in mind. [¶] What does that mean? You take a gun, you shot at a party, you are not sure who at that party is going to get hit, you can still get the kill zone. You are still endangering every single person in that line of fire." The prosecutor continued: "[T]here is the Breon Taylor group. All of these people that I listed, all of these people that were near Ms. Taylor when she was killed, they were in the path of the bullets, or the potential path of the bullets, because as [the bullets] are coming in that window, anyone who is in or around, near that counter [where Taylor was dancing], is in that kill zone and that zone of risk when she was killed. [¶] The Dennis Moses group. And this is probably even more pertinent, because they were so close to that window. That group of kids that were standing right by the window, right by the kitchen as bullets were being fired through that window, those people that were at risk just by being near him. [¶] And the outside group. And we get to this because of the shots [that struck the] car. The shooting at the building wasn't enough. These two defendants turned the gun and fired towards that group of kids that was waiting to get in the line. Fortunately, instead of hitting one of them, hit that car instead. [¶] All of those kids are all in the zone of risk. All of them potential and actual victims in this case."

For the reasons we have already explained, the prosecutor's argument was based on a legally erroneous conception of the kill zone theory. First, the prosecutor did not argue that there was a primary target (and there is no evidence that Taylor or Moses or anyone near the car was a primary target), so the argument presented no factual basis for application of the kill zone theory. The theory applies only if the defendant chooses, as a means of killing the primary target, to kill everyone in the area in which the primary target is located; with no primary target, there can be no area in which the primary

target is located and hence no kill zone.[6] Second, the prosecutor's argument assumed that individuals who are merely endangered or put "at risk" or located within "the zone of risk" are attempted murder victims on the kill zone theory. That is incorrect as a matter of law. The prosecutor never attempted to argue that Stringer (and McCloud) specifically intended to kill every single person in each of the putative kill zones, as the kill zone theory would actually require.[7]

For all of the foregoing reasons, we conclude that the trial court erred by instructing the jury on the kill zone theory. The record does not contain substantial evidence to support application of the theory in this case.

It should be noted that the Supreme Court has repeatedly explained that jury instructions on the kill zone theory are *never* required. (*Stone, supra,* 46 Cal.4th at pp. 137–138; *Smith, supra,* 37 Cal.4th at p. 746; *Bland, supra,* 28 Cal.4th at p. 331, fn. 6 [the kill zone theory "is not a legal doctrine requiring

---

[6] For the same reasons, the prosecutor's attempt to combine the kill zone theory with *Stone*—under which a defendant can be guilty of attempted murder even if there was no specific target at all—was also erroneous. The prosecutor first drew attention to the jury instruction based on *Stone*: "And one of the instructions that the judge read to you is that a person who intends to kill can be guilty of attempted murder, even if the person has no specific target in mind." The prosecutor then explained the *Stone* instruction in terms of the kill zone: "What does that mean? You take a gun, you shot at a party, you are not sure who at that party is going to get hit, you can still get the kill zone. You are still endangering every single person in that line of fire." The explanation was incorrect. The *Stone* theory applies when there is *no specifically targeted individual at all* (in *Stone*, the defendant was guilty of one count of attempted murder for firing a single bullet at a group of 10 people, intending to kill someone or other but no one in particular). The kill zone theory applies when the defendant chooses, *as a means of killing a targeted individual*, to kill everyone in the area in which the targeted individual is located. The two theories are mutually exclusive. If *Stone* applies, then there is no targeted individual, so the kill zone theory cannot apply; if the kill zone theory does apply, then there must be a targeted individual, so *Stone* cannot apply.

[7] We note that the language of CALJIC No. 8.66.1, the pattern instruction that was given to the jury concerning the kill zone theory, directly lends itself to the prosecutor's incorrect statement of the theory, so the instruction should probably be revised. The instruction provides: "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. [This zone of risk is termed the 'kill zone.'] The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity. [¶] Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a ['kill zone'] [zone of risk] is an issue to be decided by you." (CALJIC No. 8.66.1.) The instruction's repeated references to a "zone of risk" are misleading and have no basis in the law—neither the phrase "zone of risk" nor even the word "risk" appears anywhere in *Bland*. The word "risk" likewise appears nowhere in *Perez*, nowhere in the majority opinion in *Smith*, and nowhere in *Stone* apart from a quote of CALJIC No. 8.66.1. (*Stone, supra,* 46 Cal.4th at p. 137, fn. 1.) By referring repeatedly to a "zone of risk," the instruction suggests to the jury that a defendant can create a kill zone merely by subjecting individuals other than the primary target to a risk of fatal injury. As we have already explained, that is not correct.

special jury instructions"].) It is consequently *impossible* for a trial court to commit error, much less prejudicial error, by declining to give a kill zone instruction. As the Supreme Court has stated, the kill zone theory "is simply a reasonable inference the jury may draw in a given case." (*Bland, supra*, 28 Cal.4th at p. 331, fn. 6; see *Stone, supra*, 46 Cal.4th at pp. 137–138; *Smith, supra*, 37 Cal.4th at p. 746.) If the evidence supports a reasonable inference that, as a means of killing the primary target, the defendant specifically intended to kill every single person in the area in which the primary target was located, then the prosecutor can make that argument and the jury can draw that inference without the aid of a kill zone instruction—the ordinary instructions on attempted murder will provide all of the necessary legal tools.

## B. *Prejudice*

State law instructional error is reviewed for harmlessness under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836–837 [299 P.2d 243] (*Watson*). (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 214 [79 Cal.Rptr.3d 125, 186 P.3d 496].) The trial court's error in giving the kill zone instruction will therefore warrant reversal only if it is reasonably probable that Stringer would have obtained a more favorable result in the absence of the instruction. We conclude that it is.

In the prosecution's closing argument at Stringer's trial, the only articulated basis for conviction on the attempted murder charges was the kill zone theory. (For example: "[T]he important thing to take away from this is the kill zone. And this is how all those other kids, . . . this is how we get to their attempted murder. This is how we prove to you that the defendant Stringer is guilty of that.") Thus, the prosecution's argument for Stringer's guilt on each of the 46 counts of attempted murder was based entirely on an instruction that should not have been given. That strongly suggests that it is reasonably probable that Stringer would have obtained a more favorable result in the absence of the instruction.

On appeal, respondent does not argue that if the trial court erred by giving the kill zone instruction, then the error was harmless. Like the prosecution in the trial court, respondent does not attempt to present any theory on which Stringer's attempted murder convictions might be affirmed in the absence of the kill zone theory. This likewise strongly suggests that it is reasonably probable that Stringer would have obtained a more favorable result in the absence of the instruction. Indeed, we are aware of no argument for the conclusion that the erroneous giving of the kill zone instruction in this case was harmless.

The elements of attempted murder are specific intent to kill and a direct but ineffectual act toward accomplishing the intended killing. (*Smith, supra*, 37

Cal.4th at p. 739.) The kill zone instruction relates only to the intent element, and, apart from the identity of Stringer and McCloud as the principals, the only significant factual dispute on the attempted murder counts was intent. (It is not reasonably probable that, in the absence of the kill zone instruction, the jury would have failed to find that firing a semiautomatic handgun at a person is a direct act toward committing homicide.) The evidence of specific intent to kill was not overwhelming. Adams's statements to law enforcement and to Egland tended to show that Stringer intended that McCloud do no more than end the party by scaring the guests—according to Adams, Stringer told McCloud to "[e]nd the party," "shoot it up in the air," and "[j]ust scare 'em." It would nonetheless have been reasonable for the jury to find specific intent to kill because, for example, McCloud shot at the building instead of "up in the air." But given that the same evidence (namely, Adams's statements) that tended to prove the principals' identity also tended to disprove specific intent to kill, and given that the prosecution's *only* argument for a finding of specific intent to kill was based on the misapplication of the kill zone theory, we cannot conclude that the giving of the kill zone instruction was harmless. As to all 46 attempted murder convictions, it is reasonably probable that if the kill zone instruction had not been given, Stringer would have obtained a more favorable result.[8]

In addition, the McCloud jury acquitted McCloud on all 46 counts of attempted murder, convicting him of assault instead. Although each jury heard some evidence that was not presented to the other, and although Stringer's and McCloud's roles in the charged crimes were not identical, the evidence against both defendants was to a very large extent the same. Consequently, McCloud's acquittal on all counts of attempted murder is consistent with our conclusion that the evidence of specific intent to kill was not overwhelming.

For all of the foregoing reasons, we conclude that it is reasonably probable that Stringer would have obtained a more favorable result on the 46 attempted murder counts if the trial court had not erred by instructing the jury on the kill zone theory. We therefore must reverse his convictions on those 46 counts.

---

[8] This conclusion holds true even for the attempted murder of Gaines, who was wounded by one of the shots. Gaines was inside the lodge, which was dark when the shots were fired from the parking lot outside. The record contains no evidence that Stringer and McCloud specifically targeted Gaines, had any reason to target him, knew that he was inside the lodge, knew where in the lodge he was located, or even knew him at all. On this record, the bullet's striking Gaines, rather than someone else or no one at all, thus appears to be happenstance. Consequently, for purposes of harmless error analysis concerning the kill zone instruction, there is no difference between Gaines and any of the other 45 victims named in the attempted murder counts, even though the other 45 were not wounded.

II. *Sufficiency of the Evidence for 46 Counts of Attempted Murder or Assault*

McCloud argues that the evidence is insufficient to sustain his convictions on the 46 counts of assault because the record does not contain substantial evidence that he had the present ability to commit a battery on the 46 victims. Stringer likewise challenges the sufficiency of the evidence to sustain his 46 attempted murder convictions. Although we have already determined that Stringer's convictions on the 46 counts of attempted murder must be reversed because of instructional error, if the prosecution introduced insufficient evidence to sustain convictions on some of those counts then they cannot be retried on remand.

In reviewing the sufficiency of the evidence, "[w]e view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1028 [16 Cal.Rptr.3d 891, 94 P.3d 1089].) We conclude that the prosecution did not introduce sufficient evidence to support 46 assault or attempted murder convictions. The evidence introduced at trial was sufficient to sustain only eight of those 46 convictions.

A. *Attempted Murder*

The Supreme Court's decision in *Perez* controls our analysis of the sufficiency of the evidence to sustain Stringer's 46 attempted murder convictions. As discussed above, in *Perez* the defendant "fired a single bullet at a distance of 60 feet, from a car going 10 to 15 miles per hour, at a group of seven peace officers and a civilian who were standing less than 15 feet apart . . . . The bullet hit one officer in the hand, nearly severing his finger, but killed no one." (*Perez, supra*, 50 Cal.4th at p. 224.) The defendant was convicted of eight counts of attempted murder, but the Supreme Court reversed seven of the convictions, concluding that "the evidence is sufficient to sustain only a single count of premeditated attempted murder of a peace officer." (*Id.* at p. 225.) The court reasoned that "there is no evidence that defendant knew or specifically targeted any particular individual or individuals in the group of officers he fired upon. Nor is there evidence that he specifically intended to kill two or more persons with the single shot. Finally, there is no evidence defendant specifically intended to kill two or more persons in the group but was only thwarted from firing off the required additional shots by circumstances beyond his control. Without more, this record will not support conviction of eight counts of premeditated attempted murder." (*Id.* at pp. 230–231, fns. omitted.)

Here, as in *Perez*, there is no evidence that Stringer and McCloud were targeting multiple individuals. At most, the evidence might support a reasonable inference (advocated by respondent on appeal but not by the prosecution at trial) that they were targeting the individual who had punched Stringer. But the targeting of *that* individual cannot be the basis for convicting Stringer of the attempted murders of *other* individuals—the doctrine of transferred intent "does not apply to an inchoate crime like attempted murder." (*Bland, supra*, 28 Cal.4th at p. 317.) "To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Id.* at p. 328.)

Here, as in *Perez*, there is no evidence that Stringer and McCloud specifically intended to kill two or more persons per bullet fired. We analyzed that issue in part I.A., *ante*, so our discussion need not be repeated.

Here, as in *Perez*, there is no evidence that Stringer and McCloud specifically intended to kill 11 or more persons (i.e., more persons than bullets fired) but were only thwarted from firing off the required additional shots by circumstances beyond their control. For example, there is no evidence that the firearm used by Stringer and McCloud was equipped with a large-capacity magazine containing 15 rounds and that they were forced to stop shooting after the first 10 rounds because someone knocked the gun from their hands. On the contrary, the prosecution introduced no evidence from which a reasonable jury could infer that the firearm used by Stringer and McCloud contained more than 10 rounds. The police criminalist testified that the "most common" magazine size for a nine-millimeter handgun is "ten cartridges per magazine"; he acknowledged that higher capacity magazines exist but gave no indication of how likely it was that Stringer and McCloud had used one. He also testified that even with a 10-round magazine, it would be possible for the gun to have "an additional cartridge in the chamber. You could have ten plus one." But again, no evidence indicated that it was likely—as opposed to merely possible—that the gun used by Stringer and McCloud was equipped with a fully loaded 10-round magazine plus an additional round in the chamber. The lead investigating officer likewise testified that "the public is allowed to buy up to . . . a magazine that holds ten," which is "commonly available to the public," but "[l]aw enforcement can buy a larger capacity magazine." On this record, any inference that the firearm used by Stringer and McCloud contained more than 10 rounds would

have been mere speculation.[9] "Speculation is not substantial evidence." (*People v. Ramon* (2009) 175 Cal.App.4th 843, 851 [96 Cal.Rptr.3d 459].) Thus, given that there is no evidence that they intended to kill more than one person per bullet, and given that there is no evidence that they had more than 10 bullets, there is no evidence that they intended to kill more than 10 people, just as in *Perez* there was no evidence that the defendant intended to kill more than one.

All of respondent's contrary arguments have already been addressed in part I.A., *ante*. For the reasons given, we do not find respondent's arguments persuasive. Consequently, applying *Perez*, we conclude that "[w]ithout more, this record will not support conviction of [46] counts of premeditated attempted murder." (*Perez, supra*, 50 Cal.4th at p. 231.) Rather, subject to defendants' other challenges (which we discuss *post*), the evidence is sufficient to support only eight attempted murder convictions, because 10 shots were fired but two of them killed victims Moses and Taylor, for which Stringer was separately convicted and punished.

### B. *Assault**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III.–XI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

In case number B229841, *People v. Stringer*, the two murder convictions are affirmed. The 46 attempted murder convictions are reversed, the sentence is vacated, and the matter is remanded for further proceedings consistent with this opinion.

In case number B228209, *People v. McCloud*, the two murder convictions are affirmed. Thirty-eight of the 46 convictions for assault with a firearm are

---

[9] The prosecution accordingly took the position in closing argument that Stringer and McCloud had fired until the gun was empty, using all 10 of the rounds they had available. To Stringer's jury: "They loaded that gun all the way, ten full shots. . . . [¶] [¶] He squeezed that trigger every single time until every bullet that was in that gun was fired." To McCloud's jury: "[W]hen you take a gun and you point it and you fire it time after time after time until the entire magazine is gone, there is only one inescapable conclusion for the intent of the shooter . . . ." "[McCloud and Stringer] were able to leave the moment that gun had lost its last round and flee." "He squeezes the trigger ten times until every single bullet in that gun had been fired."

*See footnote, *ante*, page 788.

reversed, the sentence is vacated, and the matter is remanded for further proceedings consistent with this opinion.

Mallano, P. J., and Johnson, J., concurred.

The petition of both appellants for review by the Supreme Court was denied March 13, 2013, S207658.