Filed 9/15/16  P. v. Williams CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B265162 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA097044) |
| v. | |
| MARIO VAUGHN WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Tomson T. Ong, Judge.  Affirmed.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury found Mario Vaughn Williams (Williams) guilty of two counts of attempted murder, one count of shooting at an occupied motor vehicle, and one count of possession of a firearm by a felon. Williams appeals, and we affirm.

## BACKGROUND

An information filed May 21, 2014 charged Williams with two counts of attempted murder of Alexis Camino (Camino) and Hugo Vasquez (Vasquez), (Pen. Code,[1] §§ 664/187, subd. (a); counts 1 & 2), one count of shooting at an occupied motor vehicle (§ 246; count 3), and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 4). The information alleged that the attempted murders were willful, deliberate, and with premeditation (§ 664, subd. (a)) and that Williams personally and intentionally discharged a handgun in connection with (§ 12022.53, subd. (c); counts 1 & 2). (The trial court dismissed a gun enhancement in connection with count 3 after the prosecutor indicated she would not proceed on that allegation.) The information also alleged that Williams had a prior conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(j), 1170.12), a prior serious felony conviction (§ 667, subd. (a)(1)), and had served a prior prison term (§ 667.5, subd. (b)). Williams pleaded not guilty. After a trial at which the jury found Williams guilty on all four counts and found the firearm enhancements true, Williams admitted the prior strike, prior serious felony conviction, and prior prison term allegations. The trial court sentenced Williams to 79 years to life in state prison.

At trial, Hugo Vasquez testified that at about 9:00 a.m. on October 2, 2013, he was a passenger in the front seat of a white Ford Taurus driven by his friend Camino at the intersection of Orange and PCH. The Taurus was stopped at a red light behind another car, blocking the exit of a Jack in the Box drive-thru. Williams, alone in his car[2] in the drive-thru, shouted at them to move so he could exit. Camino turned right at the light and kept going down the street. After they passed the first green light, Vasquez noticed the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Williams' car was also a white Ford Taurus.

other Taurus was following them. Camino turned left on 15th and Williams followed. When Williams pulled his car up next to theirs and said something, Vasquez told Camino to keep going. Camino drove to the next street and Williams also kept going "kind of behind us." As Camino turned right and Williams drove straight ahead, Vasquez heard a gunshot and felt an impact on the car. He looked back and saw the little back window was shattered. Camino kept driving. When they reached Walnut, Vasquez saw that a white car like Williams's had been pulled over by the police. Camino drove to where the car was stopped and Vasquez got out, walked to the police car, and told the officer that someone from the white car had just shot at them.

Camino testified that he was stopped at a stop sign when Williams pulled his car next to them. Williams's passenger window was down, and he saw Williams "pointing the gun at us." Williams's arm was extended, sticking the gun out through the passenger-side window of Williams's car, which was about six feet away. Frightened, Camino drove to the next street with Williams following not behind him but to the side, still pointing the gun. Camino made a sharp right turn and as he turned he heard his rear window shatter. At the time of the shooting, the cars were about the same distance apart as before. Williams continued to drive straight ahead.

The officer who searched Williams's car testified that he found a gun behind the center console. One live round was stuck inside the barrel, seven rounds were in the magazine, and a spent casing on the rear passenger seat was consistent with the ammunition. A criminalist testified that the spent casing had been fired from the gun found in Williams's car. Another police officer looked into the car and saw a cup of coffee with a Jack in the Box logo in the center cup holder.

The parties stipulated that Williams had been convicted of a felony and was prohibited from possessing a firearm.

Williams testified in his own defense. On October 2, 2013, he was driving back to school at Long Beach City College from the home of his son's mother, when the police pulled him over for running a stop sign. Williams gave his identification to the officer, who returned to the police vehicle. At that moment a second white Ford Taurus pulled

3

up next to Williams, and the passenger jumped out and ran back to the police car. The officer returned with his weapon drawn and told Williams to put his hands on the steering wheel. Williams obeyed the officer's command to exit the car. The officer handcuffed him and put him in the back of the patrol car.

Williams felt nervous when he saw the police searching his car, because he was on parole and had a loaded firearm in the car, and thought he would be on his way back to prison. The officer told him that the man who had pulled up accused Williams of opening fire at him. Williams had never seen either the man who got out of the car or the driver. He often went to the Jack in the Box for lunch, but had not gone there before being pulled over. He had not had any contact with Vazquez and Camino nor had he shot at anyone that day.

In rebuttal, the officer who found the gun in Williams's car testified that he asked Williams if there was anything in the car that would violate his parole, and Williams said no. Williams also told him that he had stopped at the Jack in the Box to buy an iced coffee and was on his way to school when he was pulled over.

## DISCUSSION

### I.    Sufficient evidence supports conviction of two counts of attempted murder.

Williams argues there was insufficient evidence to support his conviction of two counts of attempted murder. Our review is limited, asking """"whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt."""" (*People v. Smith* (2005) 37 Cal.4th 733, 738–739.) We view the evidence in the light most favorable to the prosecution, and we presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. (*Id.* at p. 739.)

#### A.    *Substantial evidence supports the specific intent to kill both victims.*

First, Williams claims that one of his attempted murder convictions (without specifying which) must be reversed, because firing one shot at two persons is not evidence that he had the required specific intent to kill both. He argues that Camino and

4

Vasquez were not directly in the line of fire because a single shot was fired from behind the car, and Camino and Vasquez were seated next to each other in the front seat.

"'[A]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Smith*, *supra*, 37 Cal.4th at p. 739; *People v. Falaniko* (2016) 1 Cal.App.5th 1234, 1242.)[3]  In order for Williams to be convicted of the attempted murders of both Vasquez and Camino, the prosecution was required to prove he had the specific intent to kill both. "'To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else,'" (*Smith*, at p. 740), so that "[s]omeone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*People v. Bland* (2002) 28 Cal.4th 313, 328.)  The specific intent "may in many cases be inferred from the defendant's acts and the circumstances of the crime."  "'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . .'"'" (*Smith*, at p. 741.)  "Under the case law . . . evidence that defendant purposefully discharged a lethal firearm at the victims, both of whom were seated in the vehicle, one behind the other, with each directly in his line of fire, can support an inference that he acted with intent to kill them both." (*Id.* at p. 743.)

Further, "'"'the fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance." (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.)  In *People v. Chinchilla* (1997) 52 Cal.App.4th 683, the defendant fired a single bullet at two police officers crouched one behind the other in the line of fire, and the court concluded that intent to kill two different victims can be inferred from evidence that "the defendant fired a single shot at the two victims, both of whom were visible to the defendant."

---

[3] Williams does not allege that the jury was improperly instructed on the specific intent requirement.

5

(*Id*. at p. 685.) The defendant endangered both officers, "and a reasonable jury could infer from this that the defendant intended to kill both." (*Id*. at p. 691.) In *People v. Smith*, the defendant fired a single shot from behind at a moving car, shattering the rear window and narrowly missing a baby in a car seat in the back and the driver in the front. (*Id*. at p. 737.) The California Supreme Court concluded that the jury could properly infer that the defendant acted with the intent to kill both victims when he fired off a single shot at them from close range. (*Id*. at p. 743.) By contrast, in *People v. Perez* (2010) 50 Cal.4th 222, the court held that a single shot fired from a moving car at a group of eight people 60 feet away supported a conviction of only one of eight charged counts of attempted murder. (*Id*. at pp. 229–230.)

"[I]ntent to kill usually must be inferred from a defendant's actions and all the circumstances surrounding the alleged killing." (*People v. Smith*, *supra*, 37 Cal.4th at p. 744.) Here, the testimony was that Williams pulled up his car up right next to Camino's car at a stop sign, and pointed the gun through his passenger window at the two men sitting side by side in the front seat. Vasquez told Camino to keep going, Williams followed beside Camino's car, and while Camino was making a sharp right turn at the next street, Williams fired a single shot from about six feet away that shattered the back window of Camino's car. A jury could reasonably infer that Williams had the specific intent to kill both men. He pointed his gun out his passenger window, aiming across the front seat of Camino's car, where Camino and Vasquez were in a direct line of fire. When Camino kept moving, Williams continued to drive alongside the car. When Camino began his evasive maneuver and started turning right, Williams fired a single shot that broke the car's back window. That Williams shot as Camino turned right to avoid a shot from the gun Williams was aiming at both men does not compel a conclusion that Williams lacked the intent to kill both men. Williams continued to drive alongside Camino's car, and fired when Camino made a sharp right turn to escape. And although motive is not an element of attempted murder, "evidence of motive is often probative of intent to kill." (*Id*. at pp. 740–741.) Williams shouted angrily at the men

6

when Camino's car blocked his car's exit from the Jack in the Box drive thru and then followed them, suggesting a motive for Williams to shoot at the men.

Williams points out that although a cartridge was jammed in his gun, there was no evidence that he attempted to fire a second shot. But "[t]he fact that the defendant . . . *for whatever reason*, fired only a single shot was not dispositive." (*People v. Smith*, *supra*, 37 Cal.4th at p. 745, italics added.) That he fired only once as they turned right does not mean that the jury had to conclude that he intended to kill only one of the men. Viewed in the light most favorable to the prosecution, the evidence supported a conclusion that out of necessity, Williams abandoned his attempt to kill both men as Camino's car moved farther away. Substantial evidence supported a conclusion that Williams had the specific intent to kill both Vasquez and Camino, as required to convict Williams of two counts of attempted murder.

### B. The "kill zone" instruction does not require reversal.

Second, Williams argues that the trial court erred in giving a "'kill zone'" instruction because it was not supported by substantial evidence and, in any case, misstated the law. The defense objected to the giving of CALJIC 8.66.1 (without stating a basis), and the court responded that the instruction was appropriate "given the closeness of the car being the, quote-unquote, kill zone, it's within the perimeter of the evidence. There is substantial evidence to support that." The court instructed the jury: "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a zone of risk. This zone of risk is termed the 'kill zone.' The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity. [¶] Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a 'kill zone' or zone of risk is an issue to be decided by you." The prosecutor argued that Williams was "indiscriminate about which victims he shoots. He shoots to kill. [¶] The judge told you about something called a kill zone. So even if you think the defendant intended to kill just the driver, it's reasonable that he intended to kill everyone in the vicinity, including

7

Hugo Vasquez, because he's in the same line of fire. He was indiscriminate about who he was shooting at."

"[T]he kill zone theory . . . yields a way in which a defendant can be guilty of the attempted murder of victims who were not the defendant's 'primary target.' [Citation.] Under [*People v.*] *Bland* [(2002) 28 Cal.4th 313], 'a shooter may be convicted of multiple counts of attempted murder on a "kill zone" theory where the evidence establishes that the shooter used lethal force *designed and intended to kill everyone in an area around the targeted victim* (i.e., the "kill zone") as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm.' ([*People v.*] *Smith*, *supra*, 37 Cal.4th at pp. 745–746, italics added.)" (*People v. McCloud* (2012) 211 Cal.App.4th 788, 797.) "[T]he theory is not a legal doctrine requiring special jury instructions at all, but rather, 'is simply a reasonable inference the jury may draw in a given case.' [Citations.] [¶] A conviction for attempted murder under a kill zone theory requires evidence that the defendant created a kill zone; that is, while targeting a specific person he attempted to kill everyone in the victim's vicinity, or he indiscriminately sought to kill everyone in a particular area without having any primary target. [Citation.] In addition, before a defendant may be convicted of attempted murder under a kill zone theory, the evidence must establish that all the victims were actually in the kill zone." (*People v. Falaniko*, *supra*, 1 Cal.App.5th at pp. 1243–1244.) Because the kill zone theory is not a legal doctrine but an inference a jury may draw, jury instructions on the kill zone theory are never required. (*Id.* at p. 1243, fn. 9.)

Williams argues that the instruction was not supported by substantial evidence because Camino and Vasquez were not in the line of fire, and mere proximity in the car is not enough for a kill zone instruction. As we explained above, the evidence supports a conclusion that when Williams aimed the gun out the passenger side window, the cars were side by side and no more than six feet apart, Camino and Vasquez were in the direct line of fire, and Williams fired just as Camino made a sharp right turn as an evasive

8

maneuver. Because Camino and Vasquez were in the direct line of fire when Williams aimed out the window, Williams' intent to kill both of them was supported by substantial evidence. No "kill zone" rationale was necessary if the jury concluded that Williams specifically intended to kill both Camino and Vasquez. *People v. Smith*, *supra*, 37 Cal.4th 733, held that two attempted murder convictions may be sustained where there is evidence the perpetrator fired a single bullet at two victims who were one behind the other in his line of sight. (*Id.* at p. 748.) No kill zone instruction was given, and the Court expressly stated it had "no occasion here to decide under what factual circumstances, if any, the firing of a single bullet might give rise to multiple convictions of attempted murder under [the] kill zone rationale." (*Id.* at p. 746, fn. 3.)

The giving of the "kill zone" instruction described to the jury another inference it could draw from the facts in this case. The evidence allowed a reasonable jury to draw the inference that Williams created a kill zone by pointing his gun at Camino and Vasquez side by side in the front seat, either because he targeted Camino as the driver[4] and attempted to kill everyone in the line of fire (including Vasquez) or because he indiscriminately sought to kill everyone in the line of fire (Camino and Vasquez) without having any primary target. The evidence supported an inference that Camino and Vasquez were in Williams's line of fire, and they were also therefore in the kill zone. "If [a single bullet] did create a 'kill zone,' that zone encompassed only the persons in the single bullet's line of fire." (*People v. Leon* (2010) 181 Cal.App.4th 452, 466.) Substantial evidence supported the giving of the instruction.

Williams also argues that CALJIC No. 8.66.1 incorrectly states the law by using the phrase "zone of risk," which he contends allowed the jurors to conclude that he could be guilty of attempted murder of both Camino and Vasquez even without a finding that he had the specific intent to kill each victim of attempted murder. In *People v. McCloud*, *supra*, 211 Cal.App.4th 788, we suggested "the language of CALJIC

---

[4] The prosecutor did not argue that either Camino or Vasquez was the primary target.

9

No. 8.66.1 . . . directly lends itself to the prosecutor's incorrect statement of the theory, so the instruction should probably be revised." (*Id.* at p. 802, fn. 7.) But the jury here was also instructed repeatedly on the requirement of intent and specific intent, including in the challenged instruction ("[w]hether a perpetrator *actually intended to kill the victim*, either as a primary target or as someone within a 'kill zone' or zone of risk is an issue to be decided by you"). (Italics added.) Reading the instructions as a whole, CALJIC No. 8.66.1 did not tell the jury that they need not conclude that Williams intended to kill both victims. (See *People v. Burgener* (1986) 41 Cal.3d 505, 538.)

This is not a case like *People v. McCloud*, *supra*, 211 Cal.App.4th 788, in which the defendants fired 10 shots at a party of over 400 people from a parking lot outside, and one defendant was convicted of 46 counts of attempted murder. (*Id.* at pp. 790, 793–794.) Nor is it like *People v. Perez*, *supra*, 50 Cal.4th at p. 230, in which the defendant fired a single bullet from a moving car at a group of eight persons in a parking lot from 60 feet away. Williams fired a single shot through his car window at two victims in another car about six feet away, and was convicted of two counts of attempted murder where the evidence supported his specific intent to kill both victims. Therefore, even if the trial court erred by instructing the jury with CALJIC No. 8.66.1, no prejudice resulted. We presume the jury based its convictions on the theory supported by the evidence, and there is no affirmative indication that the jury found Williams guilty solely on a factually unsupported zone of risk theory. (*People v. Perez* (2005) 35 Cal.4th 1219, 1233.)

## II.    The trial court did not abuse its discretion in denying a motion for mistrial.

Margaret Kaleuati (Kaleuati), a senior criminalist with the Los Angeles County coroner, testified that in January 2015, she conducted an analysis on a gunshot residue kit "for Mario Williams," identified by number and containing samples for the left and the right hand. She concluded "[o]n the right hand there were several consistent particles of gunshot residue and on the left hand there were many consistent particles of gunshot residue," and "a general conclusion that we give any time that we find consistent particles . . . is that the subject may have; [(a)], discharged a firearm; [(b)], been in an

10

environment of gunshot residue; or [(c)], received these particles from an environmental source." On cross-examination, she explained that she could never say who actually discharged the firearm. The best protocol for testing would be to sample the suspect's hands immediately, or bag the suspect's hands to prevent removing or adding gunshot residue by transfer; she lacked personal knowledge whether Williams's hands had been bagged.

The next day of trial, the court had just received a field report from a forensic specialist who collected the gunshot residue from Williams's hands, and the court stated: "So far the testimony in this case is that there is gunshot residue, but there is no linkage to Mr. Williams. There is nobody that testified that his hand was bagged and that the gunshot residue was linked to Mr. Williams. [¶] That's the state of the evidence; am I right . . . ?" The prosecutor and the defense counsel both answered yes. The trial court added that he had learned from the earlier testimony that gunshot residue does not identify the shooter, but could result from being around someone who shoots, or being at a firing range. Defense counsel had not received the field report until that morning," and because it connected the residue to Williams's hand where "[t]here is an issue whether or not your client had the gunshot residue and was bagged," the court offered to exclude all gunshot residue evidence and advise the jury not to consider it for any purpose. Defense counsel asked for a mistrial "because I received new information that can never change what has already been rung," and if the report had been available beforehand "our entire defense would be different." The court denied the motion for mistrial, because "[t]here is no evidence that says Mr. Williams had any G.S.R. [gunshot residue] on him. And so— and the proposed evidence that was not previously presented is that Mr. Williams had G.S.R. in his hand." The new evidence would not exonerate Williams, and rather than a mistrial, the court would tell the jury "not to consider G.S.R. positively or negatively for any purpose." The court instructed counsel not to mention gunshot residue "for any purpose in this whole case because I have excluded it, right? You are not going to argue it in closing." During a conference on jury instructions, defense counsel agreed that the jury "weren't given from who, they were just given numbers," and requested an

11

instruction that there was no evidence connecting the gunshot residue to Williams. The court refused because it "excluded the incriminating evidence against Mr. Williams. You cannot now argue there is no G.S.R. because that would be a lie to the jury because there is," although the jury did not get to hear it. The court instructed the jury: "On the issue of GSR, the information provided for you in trial is solely to educate you on how firearms operate. You are not to consider that evidence for any other purpose. You are not to consider or speculate whether any further GSR evidence are available, and whether they have any bearing on this case."

"'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Collins* (2010) 49 Cal.4th 175, 198.) The trial court should grant a motion for a mistrial when the defendant's chances of receiving a fair trial have been irreparably damaged. (*Ibid*.)

The trial court in this case stated that nothing linked the gunshot residue to Williams, and no one had testified that his hands were bagged and tested positive for gunshot residue. But Kaleuati testified that she tested a gunshot residue kit for Williams's hands, and there were "consistent particles" on the right and left hands. She also testified that she could never say who discharged the firearm, and did not know if Williams's hands were bagged. The trial court was therefore only partially correct. No one testified that Williams's hands were properly bagged, but Kaleuati's testimony did link gunshot residue to a test kit labeled with Williams's name. The court later declined to admit evidence that further linked Williams to gunshot residue, and instructed the jury that it could not consider gunshot residue evidence for any purpose other than how firearms worked. We presume the jury followed the instruction. (*People v. Homick* (2012) 55 Cal.4th 816, 879.)

The instruction was sufficient to dispel any prejudice to Williams under *People v. Watson* (1956) 46 Cal.2d 818. Kaleuati herself described gunshot residue evidence as insufficient to show who discharged a firearm, and she did not know whether Williams's

12

hands were properly bagged and tested (as might appear in the excluded report by the forensic specialist).  The gunshot residue was not strong evidence of Williams's guilt, and the other evidence connecting Williams to the shooting was extremely strong, including two eyewitness identifications and the presence of a gun and spent casing in his car.  Williams's chance for a fair trial was not irreparably damaged by inconclusive gunshot residue evidence when the jury was explicitly instructed not to consider the evidence for any purpose.  The trial court did not abuse its discretion in refusing to grant a mistrial.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


LUI, J.