Filed 8/22/14  P. v. Gonzalez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>LEONARDO GONZALEZ,<br><br>      Defendant and Appellant. | G049832<br><br>(Super. Ct. No. FWV1100266)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br>[NO CHANGE IN JUDGMENT] |

The opinion filed in this case on August 7, 2014, is ordered modified as follows:

1.  After the last paragraph on page 19, insert the following:

*Alleged Sentencing Error*

Defendant contends the court erred in sentencing defendant. He states he should have been sentenced to "life with a 15-year minimum parole eligibility date plus 20 years for each of his attempted murder convictions instead of 35 to life on each of these counts."

The court sentenced defendant to "life to 15-year term" pursuant to section 186.22, subdivision (b), plus 20 years for the firearm enhancement under section 12022.53, subdivision (c), for a total of 35 years to life.  The trial court did not err.  (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1229.)  Additionally, we note the abstract of judgment states "15 years to Life."

The modification does not change the judgment.  The petition for rehearing is DENIED.


MOORE, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049832 |
| v. | (Super. Ct. No. FWV1100266) |
| LEONARDO GONZALEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of San Bernardino County, Stephan G. Saleson, Judge.  Affirmed.

Ellen M. Matsumoto, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant Leonardo Gonzalez guilty of attempted murder of Griselda "Grace" Lester, Michael Lester and Jessica Gallegos, finding it to be true that he personally used a firearm and personally and intentionally discharged a firearm during the crimes, that it was true defendant committed the crimes willfully, deliberately and with premeditation and that he committed the crimes for the benefit of, or at the direction of, or in association with a criminal street gang. The jury also convicted defendant of shooting at an inhabited building, that he was personally armed during the shooting, and that he committed that crime for the benefit of a criminal street gang. He was also convicted of kidnapping, false imprisonment by violence, corporal injury to cohabitant of Andrea Gallegos and felon in possession of a firearm. The court sentenced defendant to state prison for a total indeterminate sentence of 117 years to life.

On appeal, defendant contends his conviction for the premeditated attempted murder of Grace Lester violated his right to due process, and that there were several errors stemming from the court instructing the jury regarding the kill zone theory. We disagree with his contentions and affirm.

I

FACTS

*Andrea Gallegos*

Andrea Gallegos met defendant "about a year" prior to testifying on November 17, 2011. Two months later, they became intimate, and six months into the relationship, defendant got "physical."

Gallegos described the first incident: "We were at his house and he thought that I was talking to an ex-boyfriend and he pushed me, got in my face and was just yelling at my face." After then, defendant accused her of cheating on him on a daily basis, screamed at her, pushed her, shoved her and pulled her hair, and looked through her cell phone. Defendant would say such things as: "Watch what I'm going to do to

2

your family.  I'm going to do something stupid to your family.  Someone's going to pay."  Gallegos was afraid of defendant.  Defendant punched Gallegos with enough force to leave bruises.  When she would try to leave him, defendant would respond:  "Okay, somebody is going to pay."

Gallegos, her mother and her sister went to Texas for the holidays.  Defendant told her he wanted her to return before New Year's Eve, and when she did not, "he was very upset."  The prosecutor asked Gallegos how she knew defendant was so upset, and Gallegos said her grandmother called her on "the morning of New Year's" and "told me that she woke up to a loud shattered glass, which was her front door, which was completely shattered."  Later, defendant said to her, "I told you to be here before New Year's," and offered to pay for the damage.

Gallegos returned home on January 7, 2011.  On that day, defendant texted her and told her to come outside, and that, if she did not, "something was going to happen to [her] house."  Gallegos explained:  "I knew I had to go outside so my family wouldn't have to pay for anything" because defendant had told her he was going to shoot up her parents' house or set it on fire.  Defendant bore a tattoo with Gallegos's name as well as the name of her deceased son on it; he had not asked her permission to do that.  Defendant told Gallegos to get inside his car.  When she did not, "he was angry, just told [her] to get in the car," and told her he was going to do something to her family or to her, so she got in the car.  As soon as she was inside, he told her to try to open the car door, and when she did, the whole panel came off, and defendant said:  "You can't, you can't get out" and drove off.  Gallegos told defendant she did not want to go with him, and said she wanted to go back, to which defendant responded:  "You're going to come with me."  He drove directly to his house, and did not touch Gallegos, but screamed at her en route.

When they got out of the car, defendant grabbed Gallegos's phone from her back pocket and shattered it.  She said:  "I don't want to go, I don't want to go," and

3

defendant grabbed her and they went into the house. She did not feel she could leave, explaining that "he would hit me to make me stay or, once again, tell me that my family's going to pay or somebody's going to pay." She was there for six or seven days. During those six or seven days, he slapped her, pushed her, and accused her of cheating.

Defendant permitted Gallegos to attend a court hearing concerning her deceased son on January 14. When she returned to retrieve some items, defendant grabbed her face and pushed her onto a bed, shoved her onto a dresser and then onto the floor. She got up quickly and tried to grab his phone. He threw the phone against the wall and broke it, stating, "bitch, you're not going to leave me."

When defendant went into the garage, Gallegos, "walking fast" headed outside, toward her aunt, who was parked around the corner waiting for her. Defendant caught up with her and tried to force her into his car. Gallegos held onto the side of the car as defendant pushed her to try to get her inside. At that point, defendant's mother and sister came outside, and defendant's mother called out: "call the police; he's hitting her." Defendant's sister called the police and defendant's mother said: "you want to hit women, try hitting me."

Gallegos described how defendant responded to his mother: "He was cussing and he said, 'Just watch. I'm going to go to her house and I'm going to shoot her house up,' continued to call me names and jumped in his car and took off."

At trial, the prosecutor had Gallegos identify her various bruises on numerous photographs taken at the Rialto police station. Gallegos was asked how many times defendant told her he was going to shoot at her house, and she responded: "I can't even count. It was every time we would fight." On one occasion when Gallegos's aunt observed defendant "in [Gallegos's] face" and pushing her, the aunt said: "Don't you dare hit my niece." Defendant responded: "I'm going to get you too, kill you." Gallegos said defendant thought everyone in her family was trying to take her away from him.

4

Based on everything she had gone through with defendant, Gallegos obtained a restraining order against him in January 2011.

*Rachel Contreras*

Rachel Contreras is the grandmother of Gallegos. At some point, Gallegos came to live with her. According to Contreras, Gallegos moved in with her because she was trying to hide from defendant. On January 13 or 14, Contreras and her daughter Kathy took Gallegos to defendant's home so she could pick up her possessions. They dropped Gallegos off and and parked down the street. Contreras wondered why it was taking Gallegos so long and asked her daughter to drive to the front of defendant's house, and Gallegos's face was all red, and "she had bruises on her arms already" and on her chest.

Contreras related what defendant's mother stated at the time: "The mother told me that he was very violent. I guess he was always fighting with — I don't remember if it was his dad or his step dad and she made the statement at the end, she goes, 'I wish my son was dead.' She goes, 'Honest to God, I wish he was dead.'" Contreras told Gallegos: "Get in the car. You're going home. You're not going to come around this guy no more. This guy is not all there."

Contreras relayed an incident that occurred on New Year's Eve day or the day before: "Well, I was asleep and all of a sudden I heard this — it sounded like one of those big fireworks they throw at the park. It kind of just like made this real weird noise, and I got up and I go, 'What the heck was that?' And I walked in my front room and I seen all this stuff, and it was kind of dark in there so I didn't really see what was on the floor, but I seen this stuff on the floor and I go, 'What the heck?' I thought my ceiling was falling down. So I stepped over and I picked it up. It was glass." Also on the floor was a piece of "cement that holds the top of the roof or the top of a block wall fence."

5

Contreras testified she told Gallegos to tell defendant he had been seen on camera.

*Jessica Gallegos*

Jessica Gallegos is the sister of Andrea Gallegos. Jessica related an incident that occurred in the "middle" of her sister's relationship with defendant. The three of them, the two sisters and defendant, were driving in a car when, "Leo stopped the car and was screaming at her." And then he "stopped and got out and ran around to the passenger window in the front and was yelling at her." Other cars went around the stationary car as defendant yelled to Gallegos, "you don't disrespect me."

Defendant knew Jessica did not like him. When defendant was last at the family home, before she rearranged her bedroom, Jessica's head would be directly in line with a window to the front of the house when she was in bed.

*Kathy Barela*

Kathy Barela is Gallegos's aunt, and the daughter of Contreras. Gallegos sometimes stayed at her house. Barela described an occasion when defendant was parked outside her home for four to five hours. When Barela told defendant that Gallegos was not there, defendant said "that he had spoke to Andrea and that she was going to be coming to my house." She said that defendant sat outside her house waiting for Gallegos three other times. On a fourth occasion, she saw him drive by her house.

On August 25, 2010, Barela contacted the Fontana police because someone had thrown "a piece of tile, like a roofing tile," and broke two windows. Barela said it was the same kind of rock that went through her mother's window.

After Gallegos went to court on January 14, 2011, Barela and Contreras went to defendant's house in Rialto with her so Gallegos could retrieve some items she left there. Barela described what happened: "Andrea told us to park down the street so

6

we parked down the street. And she walked over to Leo's house, and she said 'I'll run in and run out,' so we waited out there and she didn't run back out, so we kept waiting. And I heard a bunch of noise but I lowered my radio down, and it was the neighbors. . . . So finally my mom tells me, 'It's been too long. Let's go see what's going on.' So I started the car and drove down the street. And then they were out there fighting."

Someone called out that the police were coming, and defendant got in his car and "zoomed off" after glaring at Barela. Before they left, defendant's mother advised Barela and Contreras "to please keep Andrea away from Leo because she was afraid for Andrea's life."

*Grace Lester and Michael Lester*

According to Contreras, Gallegos's father is Contreras's son and Gallegos's mother is Grace Lester. Grace is no longer married to Contreras's son, but is now married to Michael Lester who is Gallegos's stepfather

On one occasion, Michael Lester had a conversation with defendant about his tattoos. Defendant had tattoos on his neck and all over his shaved skull. Defendant said he couldn't have them removed because he had to get permission from the gang he belonged to. Michael asked him why, and defendant said because "he was the Mafia, Mexican Mafia."

At another point, defendant "banged on the door rather loudly" and "demanded" to see Gallegos. Michael Lester told defendant to leave. Defendant was aggressive, aggravated and upset. As defendant walked away, defendant jabbed and pointed his finger and said, "I'll be back," and Michael took that as a threat.

On another occasion, defendant telephoned Grace Lester, and when Michael Lester saw how upset his wife was, he got on the phone and told defendant: "Don't call this phone number. Stay away from this house. Do not come back."

7

In January 2011, during the time Gallegos was living at her grandmother's home, defendant's mother telephoned Grace Lester to say she was "concerned that he was going to either hurt Andrea or hurt one of her family members." Michael Lester called the police.

*The Shooting*

On January 26, 2011, at approximately 6:30 in the morning, Michael Lester walked outside to the back patio to smoke a cigarette. After about five minutes, he walked inside toward the restroom. He described: ". . . I saw the blinds blow up, heard the window break, and then I heard something behind me. The bullet went through that window and hit our fireplace, went through the fireplace screen and hit a brick and broke a brick." He added: "It came real close to my head." After that, he heard multiple gunshots.

Michael Lester ran to his youngest daughter's bedroom, grabbed her and placed her in the closet of the master bedroom. He put his wife in there too.

Michael said: "I got my shotgun and loaded my shotgun." Inside the closet, Grace dialed 911. The police arrived four or five minutes later.

A bullet was found by Gallegos's room, and another was found right below the window in Jessica's room. Michael Lester explained the living room blinds were closed, but the living room is nonetheless visible from the outside because of cracks in the blinds.

Gallegos was staying with Contreras, and Grace Lester called to tell Contreras about the shooting, and Contreras called the police, explaining "I figured he was on his way over to my house."

*The Investigation*

A neighbor of the Lesters, who was getting ready to go to work on January 26, 2011, noticed a suspicious vehicle. She described it as like blue colored. "The hood was dented and it wasn't like kind of a name brand car. It wasn't like a Honda or a Toyota and it was an older car" with limo tinting. When she was leaving to go to work she heard gunshots. She said: "[S]o I closed the door and happened to see the car pointed towards my house to like make a U-turn. And so then I saw someone jump into the car." The person wore a hood, and the car took off and went down the street.

A police investigator explained they found "three different locations that resembled that of either a penetrating mark or a strike mark to the house and also additional information given to me at the time by the officers there that a projectile had traveled through the house and had struck the fireplace, which was on the other side of the home, on the north side. All of the action was occurring on the south side of the home." The next morning, January 27, 2011, with the use of a metal detector, officers found two nine-millimeter Luger cartridge casings in a grassy area in the front of the Lesters' home.

During the afternoon of January 26, 2011, a police officer with the Ontario Police Department went to the address where defendant lived with his parents in Rialto. As the officer drove by the house, defendant crouched down beside a blue Kia Rio automobile. The officer made a U-turn and left the street, but watched the house with binoculars from about 50 yards away for a few hours. The officer observed defendant, carrying a small black bag, proceed to the side of the house, stay for about 30 seconds, and then come back to the front of the house without the black bag.

Later, a detective took the neighbor to view the Kia Rio. She recognized it. She said: "Yeah, it looked like the vehicle that was parked by my car." ". . . I noticed the

9

damage to the hood and the same dark limo tint and the color and pretty much exactly the same."

Other officers, after securing a search warrant, searched the Rialto house the night of January 26, 2011. Inside the house, they found a black hooded sweater and a pair of blue jeans. Defendant's mother said the clothes looked too large for defendant, but then she held them up to her nose and smelled them and said, "They're Leo's." Defendant's mother also told police defendant and his car were gone between 5:30 and 8:00 a.m. that morning.

At the side of the Rialto house, they found a black bag containing a Luger handgun. A magazine and loose ammunition were found in the bag's pocket.

A firearms examiner with the San Bernardino Sheriff's crime lab examined the nine-millimeter Luger, a magazine, five live rounds and fired cartridge casings found at the Lester home. He concluded the casings were fired from the Luger.

*The Trial*

The court included CALCRIM No. 600 in instructing the jury. That instruction includes the following language: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Mike Lester, Grace Lester and Jessica Gallegos, the People must prove that the defendant not only intended to kill Andrea Gallegos but also either intended to kill Mike Lester, Grace Lester and Jessica Gallegos, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Mike Lester, Grace Lester and Jessica Gallegos or intended to kill Andrea Gallegos by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Mike Lester, Grace Lester and Jessica Gallegos."

10

During argument the prosecutor stated: "Now, there's some really interesting concepts for attempted murder that you don't see on T.V. and that you don't see in the news and everyday life. The basic concept of attempt murder is that the defendant took at least one direct but ineffective step towards killing someone, and the defendant intended to kill that person. That's it. That's all you have to do. That is all this defendant had to do was to take one step towards killing Mr. Lester, Mrs. Lester or Jessica Gallegos. [¶] In this case, he took much more than one step. He brought a gun, he brought ammunition, he loaded the gun and he pointed it at vital areas of the house in an attempt to kill them. [¶] But there's some definitions that go along with attempted murder. And there's a theory—and this is only one of the theories that you can use to find him guilty of attempted murder. There's several—we're going to talk about kill zone because it does kind of apply in this case. That's the term that the jury instruction actually uses. [¶] Is anybody in a kill zone? If you're standing in the middle of a crowd and a suspect wants to kill somebody in that crowd and he's willing to shoot into that crowd, knowing that he could take out anybody else in that crowd, he's responsible for an attempted murder of everybody in that crowd, even if he doesn't hit them. Okay? That's what the kill zone theory is all about. [¶] A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or kill zone. [¶] And these—I pulled out of the jury instructions. In order to convict the defendant of attempted murder of Mike, Grace or Jessica, I must prove that the defendant not only intended to kill Andrea but also either: He can, on his own, just intend to kill Mike, Grace and Jessica. He doesn't have to want to kill Andrea. This is the first theory. He can just want to kill those three individuals because he hates them enough because they're standing in the way of him getting to Andrea, and that they are keeping him from Andrea. [¶] So as long as — He could either intend to kill each one of those individually or he could intend to kill anybody in that house, thinking, number one, that Andrea is in

11

there, or that he that he just wants to take everybody out in the house because he can't stand anybody in that house because they're keeping him away. See, two concepts. [¶] So he can intend to kill the separate victim. What do you have of evidence that he was going for — well, probably not a good choice of words — that he was attempting to kill Mike, and Jessica? Well, he shot in separate windows. He shot one clearly belonging to Jessica, whom he did not like. He shot into Andrea's window, who just filed a restraining order against him on January 20th, and he shot into a window of — that Mike Lester was walking through or that any family member could have easily been walking through at 6:30 in the morning when everybody is getting up to go to work."

The prosecutor later argued to the jury: "The first shot through the first window, C, you remember that was the window all the way over on the left, that supports attempted murder of all three people. One shot, okay, some of you might be thinking, 'well, you know, Grace Lester was in the closet and she was in the [master] bedroom and there was no shot into the master bedroom.' The problem with that is that Grace Lester could have been walking by that window instead of Mike Lester, and so could have Andrea. Anybody could have been. The fact that there's one shot through a window means he didn't care to who was walking by that window. He cared that he was going to get into Andrea's room and into Jessica's, but the shot through the window, that supports—that's evidence that supports an attempted murder for anybody in that house, that anybody could have been walking through there." Shortly thereafter, the prosecutor stated: "The attempted murders, one shot into the main window is enough to prove all counts."

During deliberations, the jury asked the following question: "Can we please have a more specific definition of the term 'kill zone'? [¶] Note on page 22 – judges #'s bottom paragraph does not define 'kill zone' to where we are comfortable." The minutes reflect "Court and Counsel at Bench." Handwriting at the bottom of the

12

jury's question states: "The reference to 'kill zone' in instruction #22 is as clear as we can make it."

II

DISCUSSION

Defendant's argument begins: "Although there was sufficient evidence to prove [defendant's] intent to kill Mike and Jessica based on the shots he fired through the living room window and Jessica's room, [defendant's] express malice towards Grace was not shown by the evidence. Grace was not in the line of fire of any shots." He further argues the trial court erred in answering the jury's question, wrongly instructed on the kill zone theory which allowed the prosecutor to commit misconduct during argument and that trial counsel was ineffective for failing to object to the prosecutor's misconduct in arguing these theories. To some extent, all of the arguments are intertwined in the briefs, and we will do the same.

If the verdict is supported by substantial evidence, the reviewing court must accord due deference to the trier of fact and not substitute its own evaluation of a witness's credibility for that of a fact finder. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) To prove attempted murder, the prosecution must prove "'specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.]" (*People v. Stone* (2009) 46 Cal.4th 131, 136.)

An intent to kill exists when the perpetrator desires the victim's death, or knows to a substantial certainty that the victim's death will occur. (*People v. Booker* (2011) 51 Cal.4th 141, 178.)

In *People v. Smith* (2005) 37 Cal.4th 733, the defendant shot into the back of a slowly moving car driven by a mother, whose baby was secured in a car seat directly behind her. The California Supreme Court concluded "the evidence is sufficient to support the jury's verdict finding defendant acted with intent to kill the baby as well as

13

the mother.  The fact that only a single bullet was fired into the vehicle does not, as a matter of law, compel a different conclusion." (*Id.* at p. 736.)  With regard to the holding in *Smith*, the Attorney General agrees with defendant "that there is insufficient evidence under *Smith*" based on Grace Lester not being in the direct line of fire.  We do not find any indication the prosecutor made any argument along the lines of the *Smith* holding.

In *People v. Bland* (2002) 28 Cal.4th 313, the defendant was a member of a criminal street gang and the victim belonged to a different gang.  The defendant approached a car the victim was driving and started shooting into the vehicle with a .38-caliber handgun.  The victim started driving away, and the defendant and another man fired into the car.  The car crashed into a pole, and the victim died of a gunshot wound to the chest.  The two passengers were wounded, and the jury convicted the defendant of one first degree murder and two premeditated attempted murders.  (*Id.* at p. 318.)  "The Court of Appeal reversed the two attempted murder convictions, finding the trial court erroneously instructed the jury on the doctrine of transferred intent." (*Ibid.*)

In reversing the judgment of the Court of Appeal which reversed the attempted murder convictions, the California Supreme Court analyzed:  "Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder—due to transferred intent—if the person were killed.  To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else.  The defendant's mental state must be examined as to each alleged attempted murder victim.  Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*People v. Bland*, *supra*, 28 Cal.4th at p. 328.)  The court continued:  "The conclusion that transferred intent does not apply to attempted murder still permits a person who shoots at a group of people to be punished for the actions towards everyone in the group even if that person primarily targeted only one of them.  As to the

14

nontargeted members of the group, the defendant might be guilty of crimes such as assault with a deadly weapon or firing at an occupied vehicle. [Citation.] More importantly, the person might still be guilty of attempted murder of everyone in the group, although not on a transferred intent theory." (*Id.* at p. 329.) The court concluded that "the evidence here virtually compelled a finding that, even if defendant primarily wanted to kill Wilson, he also, concurrently, intended to kill the others in the car. At the least, he intended to create a kill zone." (*Id.* at p. 333.)

In *People v. McCloud* (2012) 211 Cal.App.4th 788, the defendants fired 10 shots from a semiautomatic handgun at a party with over 400 people. Three bullets struck three victims. Tried by separate juries, both were convicted of second degree murder for two deaths and one of the defendants was convicted of 46 counts of attempted murder. (*Id.* at pp. 790-791.) That court stated: "The kill zone theory thus does *not* apply if the evidence shows only that the defendant intended to kill a particular targeted individual but attacked that individual in a manner that subjected other nearby individuals to a risk of fatal injury." (*Id.* at p. 798.) The court continued: "Rather, the kill zone theory applies only if the evidence shows that the defendant tried to kill the targeted individual *by killing everyone in the area in which the targeted individual was located.* The defendant in a kill zone case chooses to kill *everyone* in a particular area as a means of killing a targeted individual within that area. In effect, the defendant reasons that he cannot miss the intended target if he kills *everyone* in the area in which the target is located." (*Ibid.*)

In his brief, defendant contends the court here erred in instructing with CALCRIM No. 600 because the instruction suggested he created a kill zone merely by subjecting individuals other than the primary target to a risk of fatal injury. When we consider the instruction in its entirety, we cannot conclude the language is confusing with regard to kill zone or zone of harm references in the instruction. Nor can we conclude the

15

jury thought it was being instructed that defendant could have created a kill zone merely by subjecting individuals other than the primary target to a risk of fatal injury.

The record in this case is replete with evidence of defendant's dislike of Gallegos's family and threats toward her family. Defendant thought everyone in her family was trying to take her away from him. Defendant told her: "Watch what I'm going to do to your family. I'm going to do something stupid to your family. Someone's going to pay." Another time, he told her he was going to do something to her family or to her, so she got in his car. In January 2011, during the time Gallegos was hiding at her grandmother's home, defendant's mother telephoned Grace Lester to say she was "concerned that he was going to either hurt Andrea or hurt one of her family members."

Defendant was quite verbal about not wanting Gallegos to leave him, and she was hiding from him. Also, in January 2011, Gallegos obtained a restraining order against defendant, about which a jury could have reasonably concluded defendant was upset. The slats of the living room blinds did not close completely, and it is likely some movement could be seen from the outside when Michael Lester went back inside after smoking his cigarette. There was evidence of multiple shots. Police found that three bullets hit the house.

We find a jury could reasonably have inferred from this evidence that defendant used lethal force and intended to kill everyone in the house in order to kill Gallegos. There was evidence the manner in which defendant fired the shots, through different windows on both the north and south sides of the home, demonstrates he intended to kill everyone inside. Also there was evidence he had previously threatened to harm all of the victims of the attempted murders because he thought they were each trying to keep him from Gallegos.

16

We conclude there was sufficient evidence to support both theories advanced by the prosecutor, that defendant attempted to murder Michael Lester, Grace Lester and Jessica Gallegos individually, and that he intended to kill everyone in the home to accomplish his intent to kill Gallegos. Under the circumstances we find in this record, we cannot conclude the trial court erred in instructing the jury about a kill zone.

*The Jury's Question About the Kill Zone Instruction*

With regard to the jury's question about CALCRIM No. 600, the kill zone instruction, we find no indication the jury was mislead or confused by the court's response to it. The court had a duty to help the jury understand the legal principles the jury was asked to apply, which is what the court did in this case. (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1331.) In its question, the jury did not indicate any misunderstanding of the legal principle involved, but merely indicated it desired to feel more comfortable about the principle. There was no request for any further clarification. We find no error in the court's response to the jury question.

*The Prosecutor's Argument About the Kill Zone Instruction*

As to defendant's contention there was prosecutorial misconduct in closing argument about a kill zone, under the federal Constitution, when a prosecutor's intemperate behavior comprises a pattern so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process, it is misconduct. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1124.) Under California law, misconduct is committed by a prosecutor who uses deceptive or reprehensible methods to persuade a jury. (*Ibid.*) It is also misconduct to misstate the law during closing argument. (*People v. Gray* (2005) 37 Cal.4th 168, 217.)

"'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.  [Citation.]'  [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 820.)  Since trial counsel did not object at trial, the issue was not preserved for appeal and was forfeited.  (*People v. Guerra*, *supra*, 37 Cal.4th 1124.)

Here the prosecutor argued:  ". . . If you're standing in the middle of a crowd and a suspect wants to kill somebody in that crowd and he's willing to shoot into that crowd, knowing that he could take out anybody else in that crowd, he's responsible for an attempted murder of everybody in that crowd, even if he doesn't hit them.  Okay?  That's what the kill zone theory is all about."  The prosecutor's explanation about a kill zone does appear to be erroneous pursuant to the holding in *People v. McCloud*, *supra*, 211 Cal.App.4th 788.

Prosecutors are given wide latitude in trying their cases, but misstating the law can amount to misconduct.  (*People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1268-1269.)  Nonetheless, even had defendant's contention of prosecutorial misconduct been preserved for appeal and even if the prosecutor argued an incorrect statement about the law, we conclude defendant has not shown he was prejudiced by the prosecutor's argument.  Where a prosecutor engaged in misconduct, the reviewing court considers the record as a whole to determine if the alleged harm resulted in a miscarriage of justice.  (*People v. Duncan* (1991) 53 Cal.3d 955, 976-977.)  In considering prejudice "when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.  [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

The court carefully instructed the jury with respect to the intent requirement omitted in the prosecutor's argument: "In order to convict the defendant of the attempted murder of Mike Lester, Grace Lester and Jessica Gallegos, the People must prove that the defendant not only intended to kill Andrea Gallegos but also either intended to kill everyone within the kill zone." The court also instructed that defendant "acted *willfully* if he intended to kill when he acted. The defendant . . . *deliberated* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant . . . *premeditated* if he decided to kill before acting."

Further, the court told the jury that it must follow the law "as I explain it to you," and that "[i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." "We presume the jury followed the instructions it was given." (*People v. Chism* (2014) 58 Cal.4th 1266, 1299.) Accordingly, we find no prejudice resulting from the prosecutor's misstatement of the law. We conclude there has been no miscarriage of justice.

*Alleged Ineffective Assistance of Counsel*

Defendant contends his counsel was ineffective in not objecting to the prosecutor's arguments about a kill zone. Necessarily, since defendant has not demonstrated prejudicial prosecutorial misconduct, he has likewise not demonstrated ineffective assistance of counsel by failing to object on the basis of prosecutorial misconduct. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.)

19

III

DISPOSITION

The judgment is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.