Filed 7/27/22  P. v. Castro CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PAUL GABRIEL CASTRO,<br><br>    Defendant and Appellant. | F079074<br><br>(Super. Ct. No. VCF317661A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Kathryn T. Montejano, Judge.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Paul Gabriel Castro was convicted of multiple offenses, including three counts of attempted second degree murder and one count of active participation in a criminal street gang, arising out of a gang-related fight that ended with two people being

shot.  The jury also found true various enhancements, including firearm and gang allegations.  He raises several issues on appeal.  We conclude one of his attempted murder convictions, his active gang participation conviction, and the findings on the gang allegations must be reversed, but otherwise affirm.

## STATEMENT OF THE CASE

The crimes here were committed on May 6, 2015.  In August 2016, the Tulare County District Attorney filed an information charging Castro, along with codefendants Isaiah Richard Castro[1] and Gonzalo Gonzalez, Jr., with the following:  three counts of attempted murder (Pen. Code, §§ 664/187, subd. (a);[2] count 1 [victim T.], counts 3 and 5 [victim C.]); two counts of assault with a firearm (§ 245, subd. (a)(2); count 2 [victim T.], count 4 [victim C.]); assault with a deadly weapon (a knife) (§ 245, subd. (a)(1); count 6 [victim C.]); and active participation in a criminal street gang (§ 186.22, subd. (a); count 7).

In connection with counts 1 and 3, the information further alleged as to Castro (1) that a principal discharged a firearm in a gang case causing great bodily injury (§ 12022.53, subds. (c), (d) & (e)(1)); (2) that a principal was armed with a firearm (§ 12022, subd. (a)(1)); (3) that Castro personally inflicted great bodily injury (§ 12022.7, subd. (a));[3] and (4) that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(4)).

In connection with counts 2 and 4, the information further alleged as to Castro: (1) that Castro personally used a firearm (§ 12022.5, subd. (a)); (2) criminal street gang

---

[1] For clarity, we refer to Isaiah Richard Castro as "Isaiah."

[2] All statutory references are to the Penal Code.

[3] The section 12022.7, subdivision (a), enhancement was not initially included in the information as to counts 2, 3, or 4.  As discussed in section V of the Discussion, the information was amended before closing argument to include this allegation as to counts 2, 3, and 4.

enhancement allegations (§ 186.22, subd. (b)(1)(B) & (C)); and (3) that Castro personally inflicted great bodily injury on victim T. (§ 12022.7, subd. (a)).

In connection with count 5, the information further alleged as to Castro: (1) that a principal was armed with a firearm (§ 12022, subd. (a)(1)); and (2) a criminal street gang allegation (§ 186.22, subd. (b)(4)).  As to Gonzalez, it was further alleged Gonzalez personally used a deadly and dangerous weapon (a knife) (§ 12022, subd. (b)(1)).[4]

As to count 6, and as to Castro, the information further alleged a criminal street gang enhancement (§ 186.22, subd. (b)(1)(B)).

As to all counts, the information further alleged Castro had suffered two prior felony convictions within the meaning of section 1203, subdivision (e)(4).

Jury trial started January 14, 2019.  The jury returned guilty verdicts on each count as to Castro.  On counts 1, 3, and 5, the jury found the premeditation special allegations not true, but found the remaining enhancement allegations true as to all counts.  As relevant to this appeal, the jury found Gonzalez guilty on count five (attempted murder of C.) and found true the enhancement allegation that he personally used a deadly and dangerous weapon (a knife) during the commission of the offense.

On March 19, 2019, the court sentenced Castro to the upper term of nine years for attempted second degree murder on count 1, plus a consecutive term of 10 years for the gang enhancement, plus a consecutive indeterminate term of 25 years to life for the section 12022.53, subdivision (d), enhancement.[5]

---

[4] We mention this allegation as to Gonzalez to make clear that count 5 is the attempted murder that involved the use of a knife (as opposed to a gun).

[5] The information, as to counts 1 and 3, referenced section 12022.53, subdivisions (c) and (d).  The jury's verdict form then recited the language of section 12022.53, subdivision (d)—i.e., it referenced great bodily injury—but it listed only subdivision (c) and not subdivision (d).  After the jury returned its verdicts, the People filed a "memorandum on clerical error affecting jury's verdict" in which they indicated that the listing of subdivision (c) in the jury's verdict form had been a clerical

On count 3, the court imposed a consecutive term of two years, four months (one-third the middle term), plus three years four months (one-third the middle term) for the gang enhancement, plus a consecutive term of 25 years to life for the section 12022.53, subdivision (d), enhancement.

On count 5, the court imposed a consecutive term of two years, four months (one-third the middle term), plus a consecutive term of three years, four months (one-third the middle term) for the gang enhancement, plus a consecutive term of four months (one-third the middle term) for the section 12022, subdivision (a)(1), enhancement.

The court imposed but stayed under section 654 terms on counts 2, 4, 6, and 7. The court also imposed a consecutive term of eight months for Castro's violation of probation in a prior case.

The court ordered $101,805.81 in victim restitution and ordered the defendants be jointly and severally liable for the amount. Castro received 1,599 days of total time credits against his sentence.

**FACTS**

### I.     The crimes

On May 6, 2015, C., a former Norteno gang member, went to a grocery store with his girlfriend and two of his five children. He got out of his car and saw a Hispanic male later identified as Castro urinating in the parking lot. Because he was with his girlfriend and children, he said to Castro, "Come on, man." Castro responded, "Oh, my bad."

Castro looked C. up and down and asked for a cigarette, and C. told him he did not smoke. C. was wearing blue sandals at the time. Blue is the color of the Sureno gang, a rival of the Norteno gang. Nortenos wear the color red. However, because C. was a

---

error and that based on the language of the verdict form, the jury had found a subdivision (d) allegation true. At the next hearing, defense counsel agreed that it was a clerical error and the court issued an order clarifying that the jury had found an allegation true under section 12022.53, subdivision (d), and not subdivision (c).

4.

dropout, he believed he could wear whatever color he wanted. C. knew that Nortenos were supposed to react, often with violence, when they encounter Surenos. Castro asked C. if he "banged" and if he was a "scrap," which is a derogatory term for a Sureno. C. smirked and told Castro he was not a scrap and said he was with his kids. C. kept walking and saw Castro reach toward his waistband. C. knew that the waistband is where one would carry a gun. Sensing trouble afoot, he told his girlfriend to go inside with his two daughters and tell the store manager to call police.

As C. approached the store entrance, three Hispanic men were exiting the store. Castro told the men that C. was a scrap. C. knew from his gang experience that "something was gonna happen." One of the men "socked" C., launching the full-fledged attack on him. C. was fighting against three men before "two [or] three more" joined in. C. defended himself valiantly and effectively. Castro, Gonzalez, and Isaiah were all involved in the fight. One of the assailants was yelling, "West Side," during the attack. The fight was captured on a store surveillance video which was played at trial.

During the fight, C. saw that one of the men, who C. later identified as Gonzalez, had a knife in his hand. Gonzalez swung the knife several times trying to stab C., but C. was not stabbed. C. agreed with the prosecutor's description that "multiple people" were "getting on top of [him] during the struggle." Others were punching him while Gonzalez tried stabbing him. C.'s girlfriend tried to pull attackers off of C.

The fight, which had begun outside the store entrance before moving inside, stopped for a moment as C. and his attackers moved back toward the entry way. The attackers were blocking C.'s way out toward the parking lot; that is, C. was positioned in the entry way, facing the parking lot, and his attackers were across from him, facing the store. Castro then pulled a firearm from his waistband and began shooting at C.

C. was shot twice, once in the arm and once in the back. About a minute and forty seconds had elapsed from when the fight started to when C. was shot. C. testified a "few seconds" elapsed between the last time he was hit with a blow and when he was shot. C.

5.

estimated Castro shot him from about 22 feet away. T.,[6] who was the store manager and tried helping break up the fight, was also shot twice, once in the chest and once in the leg. When Castro began shooting, T. was standing behind and near C.

C. was transported to the hospital, where he stayed for two to three weeks. He needed surgeries. C. testified he still had scars and suffered from back pain. T. was also taken to the hospital, where he spent six days. T. underwent three surgeries and, at the time of trial, still suffered from chest, stomach, and back pain, and was 40 percent disabled.

A.S., a male, was with the defendants during the crimes. He knew Castro, Isaiah, and Gonzalez because all four were Norteno gang members. He had known Castro in particular for seven years at the time of trial. A.S., Castro, and Isaiah were affiliated with the "West Side Tulare" street gang, which was a Norteno subset. Gonzalez was affiliated with a different Norteno subset, "East Side Tulare." A.S. often went out with Castro and Isaiah looking for Surenos to assault.

A.S. testified that he was with Castro, Isaiah, Gonzalez, and others at a park hanging out before driving to the store where the crimes occurred. A.S. saw Castro put a gun into his waistband before they left the park. A.S. also said Gonzalez told him he had a knife. A.S. said when the group arrived at the store, A.S., Isaiah, and another person named Orlando went into the store to shop, and Castro and Gonzalez went into the store to use the restroom.

A.S. testified all three codefendants were involved in the fight. A.S. said he assisted in the fight by shoving C. A.S. said there came a point when the fight "kinda stopped" and C. was standing outside the store. A.S. then saw Castro pull out the same gun he had at the park and shoot C. The group then got into the same car they arrived in and went to another Norteno member's house.

---

[6] T. is male.

6.

A.S. further testified that Castro and his codefendants were laughing about the shooting on the car ride away from the scene. Someone in the group said, "We got him."

A.S. testified he was originally charged with the same offenses as the three codefendants here, but testified for the prosecution pursuant to a plea agreement in which he pleaded guilty to an assault charge with a gang enhancement. A.S. received a four-year sentence "with half time and a strike."

## II.    Gang evidence

In addition to testifying about the crimes, A.S. was also designated as a gang expert and testified about the West Side Tulare gang. He testified about the organization and structure of the gang and explained that West Side Tulare cooperated with other Norteno subsets. He also testified that all three codefendants were active gang members at the time of the crimes. A.S. also explained the rivalry between Nortenos and Surenos and said that a frequent gang activity was to go out on patrols looking for Surenos to beat up. Killing a Sureno would increase one's prestige within West Side Tulare. On the other hand, failing to attack a Sureno on the street would result in discipline.

The prosecution also presented evidence from several law enforcement officers concerning prior gang-related contacts between each of the codefendants and law enforcement. One officer, for example, testified that on one occasion he was speaking with Castro, who was the suspect in an investigation, and Castro admitted to the officer he was a Norteno gang member. That same officer testified that on another occasion he spoke with Isaiah and Gonzalez as part of a homicide investigation, and both admitted they were Norteno gang members.

Sergeant Raymond Guerrero testified for the prosecution as a gang expert. He testified about the structure of the Norteno gang and its rivalry with the Sureno gang. He testified about Norteno clothing, tattoos, graffiti, and symbols. He stated the primary activities of the Norteno gang include assault, attempted homicide, homicide, stealing

7.

vehicles, and burglary. Guerrero opined Castro, Isaiah, and Gonzalez were all Norteno gang members, based on a consideration of multiple factors.

Guerrero also identified three crimes committed by other Norteno gang members. The first was an attempted murder committed by Manden Torres in March 2011. Guerrero was familiar with this case from reviewing the police reports and contacting the investigating officers. A certified copy of Torres's record of conviction was admitted into evidence. Guerrero opined Torres was a Norteno gang member from reading reports.

The second was an assault with a deadly weapon committed by Desiree Morales in March 2012. Guerrero was familiar with the case from reviewing past reports and contacting the investigating officers. A certified copy of Morales's record of conviction was admitted into evidence. Guerrero opined Morales was a Norteno gang member from reading reports.

The third was a murder committed by Frankie Hernandez in August 2013. Guerrero was familiar with this offense because he was one of the investigators on the case. A certified copy of Hernandez's record of conviction was admitted into evidence. Guerrero opined Hernandez was a Norteno gang member "based upon the research that [he] personally conducted."

Based on a hypothetical tracking the facts of this case, Guerrero opined the crime was committed for the benefit of the Norteno gang. He explained that the hypothetical crime would instill fear of the Norteno gang within the community and within rival gangs and would build respect for the gang.

## DISCUSSION

### I. Attempted murder of T.

Castro contends, and the People agree, that his conviction on count 1 of the attempted murder of T. must be reversed because there was insufficient evidence Castro acted with a specific intent to kill T. We agree as well.

8.

## A.     Standard of review

"When a conviction is challenged on appeal for insufficient evidence to support it, we apply the substantial evidence standard of review.  [Citations.]  In so doing, we review the whole record in the light most favorable to the judgment to determine whether there is substantial evidence to support the conviction.  [Citations.]  Substantial evidence is evidence that is reasonable, credible, and of solid value such that a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses."  (*People v. Jennings* (2019) 42 Cal.App.5th 664, 671.)

## B.     Analysis

" ' "The mental state required for attempted murder has long differed from that required for murder itself.  Murder does not require the intent to kill.  Implied malice—a conscious disregard for life—suffices.  [Citation.]" [Citation.]  In contrast, "[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." ' " (*People v. McCloud* (2012) 211 Cal.App.4th 788, 796—797 (*McCloud*).)

" 'Under the classic formulation of California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and [kills] a bystander instead is subject to the same criminal liability that would have been imposed had " 'the fatal blow reached the person for whom intended.' " [Citation.]  In such a factual setting, the defendant is deemed as culpable as if he had accomplished what he set out to do.' " (*McCloud, supra,* 211 Cal.App.4th at p. 797.)

"Although transferred intent can support murder convictions if nontargeted individuals are killed, transferred intent *cannot* support *attempted* murder convictions concerning nontargeted individuals who were not killed.  '[I]ntent to kill does not transfer to victims who are not killed, and thus "transferred intent" cannot serve as a basis for a finding of attempted murder.  [Citation.]' [Citation.]  Thus, '[s]omeone who in truth does

9.

not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder—due to transferred intent—if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others.' " (*McCloud, supra,* 211 Cal.App.4th at p. 797.)

The record contains no evidence Castro intended to kill T., and the prosecution did not argue otherwise. To the contrary, the record shows that Castro only specifically intended to kill C. and that T. was struck twice by accident. The prosecution improperly relied on the transferred intent doctrine to obtain the conviction. The prosecutor told the jury during closing argument:

> "Count 1 is going to be attempted murder, and it's the attempted murder of [T.], and there's one thing I want to discuss about that. We've talked a lot about why C. was targeted specifically, because he was seen as a Sureno, and so you might ask well, if he was a target and they intended to kill him, how are we charging the defendants with attempted murder of [T.] who is an accidental person?

> "And the reason behind that is something called transferred intent. You can't try to kill someone and miss and nearly kill someone else and then claim well, it was just a mistake.

> "You—the same intent that goes for [C.] is transferred over to [T.] because he is also a victim in this. He is a victim as much as [C.] even if he wasn't the actual target of it, and so that is why we're looking for a verdict of guilty on attempted murder for [T.] and his injuries."

The conviction on count 1 must be reversed because there was insufficient evidence Castro specifically intended to kill T. and because the transferred intent doctrine does not apply to attempted murder charges.[7]

## II. Convictions on counts 3, 4, 5, and 6

Castro was convicted of two counts of the attempted second degree murder of C. and two counts of assault on C. Counts 3 (attempted murder) and 4 (assault with a firearm) were based on Castro's shooting of C., and counts 5 (attempted murder) and 6 (assault with a deadly weapon) were based on Castro's aiding and abetting Gonzalez's attempt to stab C.

Castro contends each of these two sets of dual convictions (two for attempted murder and two for assault) (1) constituted multiple convictions for different statements of the same offense in violation of section 954; (2) resulted in improper "fragmentation" of the same crime in violation of double jeopardy principles; and (3) violated the prohibition on multiple convictions, based on alternative theories of criminal liability, for a single act against a single victim. All three of these related claims rest on the same premise that Castro's participation in the stabbing attempt and his subsequent shooting of C. constitutes only a single criminal act. Castro asserts his convictions in counts 5 and 6 must be reversed. We reject all his arguments.

### A. Section 954

#### 1. *Background law*

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct. 'In California, a single act or course of conduct by a defendant can lead to convictions "of *any number* of the offenses

_____

[7] As an alternative ground for reversing the conviction on count 1, Castro contends the prosecutor committed prosecutorial misconduct when he inaccurately told the jury during closing argument that the law of transferred intent applied to attempted murder. Since we are reversing on the first ground, we need not address this second ground.

charged." ' " (*People v. Reed* (2006) 38 Cal.4th 1224, 1226—1227 (*Reed*), original italics; *People v. White* (2017) 2 Cal.5th 349, 354; *People v. Correa* (2012) 54 Cal.4th 331, 336—337.)  Under section 954, a separate conviction is permissible for each completed crime, as determined by the statutory elements of the crime, even if the defendant had the same intent and objective in committing the multiple crimes and even if the defendant committed the crimes at or near the same time.  (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1474—1477 (*Johnson*).)

The question of whether multiple convictions are proper is reviewed de novo, "as it turns on the interpretation of section 954."  (*People v. Villegas* (2012) 205 Cal.App.4th 642, 646.)

"[D]espite the seemingly absolute language of section 954," there are judicially created exceptions to the general rule permitting multiple convictions.  (*People v. Ortega* (1998) 19 Cal.4th 686, 692, disapproved on other grounds in *Reed, supra,* 38 Cal.4th 1224, 1228—1229; *People v. Sanders* (2012) 55 Cal.4th 731, 736.)  For example, multiple convictions may not be based on necessarily included offenses, and "[w]hen a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed."  (*Id.* at p. 736.)

As a separate matter, while section 954 "authorizes multiple convictions for different or distinct offenses," it does not "permit multiple convictions for a different statement of the same offense when it is based on the same act or course of conduct.' " (*People v. Vidana* (2016) 1 Cal.5th 632, 650 (*Vidana*).)

*Vidana* held the defendant in that case could not be convicted of both larceny (§ 484, subd. (a)) and embezzlement (§ 503) for the same conduct, even though the offenses had different elements and were not lesser included offenses.  (*Vidana, supra,* 1 Cal.5th at p. 650.)  *Vidana* held that while larceny and embezzlement had different

elements and were defined in separate statutes, the Legislature had expressly stated in section 490a "that '[w]herever any law or statute of this state refers to or mentions larceny, embezzlement, or stealing, said law or statute shall hereafter be read and interpreted as if the word "theft" were substituted therefor.' [Citation.] … [T]he obvious intent of this statute—enacted at the same time section 484 [larceny] was amended to include embezzlement—was to create a single crime of theft. In deciding whether larceny and embezzlement are different offenses, our focus is on the Legislature's intent. '[I]f the Legislature meant to define only one offense' in amending section 484 in 1927, 'we may not turn it into two.' " (*Vidana, supra,* 1 Cal.5th at p. 648.)

Neither the lesser included offense exception nor the circumstances addressed in *Vidana* exist in this case.

### 2. Bailey *and later decisions*

Castro relies on *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*) and other cases to support his argument that he could not be convicted of two separate counts of attempted murder and two separate counts of assault because the crime constituted only a single act. He discusses *Bailey* not in the context of section 954, but in the context of his crime-splitting, double jeopardy argument. However, the issue in *Bailey* centered on interpreting section 954, so we discuss the case in the context of section 954.

In *Bailey, supra,* 55 Cal.2d 514, the defendant fraudulently applied for and received multiple welfare payments from a county agency. She was convicted of one count of grand theft and moved for a new trial. The trial court granted the motion, and the People appealed from that order. (*Id.* at pp. 515—518.) *Bailey* addressed whether the defendant was guilty of one count of grand theft or a series of petty thefts. (*Id.* at p. 518.) *Bailey* created an exception to section 954's general rule and upheld the single conviction, concluding a series of separate thefts from the same victim could, in certain circumstances, be aggregated into a single count of grand theft. *Bailey* held the relevant

13.

test was whether there was "only one intention, one general impulse, and one plan," and concluded defendant was properly convicted of a single count. (*Id.* at pp. 519—520.)

"Subsequent decisions have construed *Bailey* as being a two-sided coin, granting criminal defendants the right to insist upon the dismissal of all but one conviction when multiple crimes are unified by a single intent, impulse or plan. [Citation.] [¶] The courts have since struggled with the contours of this 'converse *Bailey*' doctrine. The decisions applying this doctrine have cited a variety of rationales, but its applicability ultimately turns on the nature of the underlying crimes at issue. These crimes—and the rule governing them—fall into two categories." (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1517 (*Kirvin*).)

"The first category pertains to crimes that treat harm or damage as one of their elements, and which permit the prosecution to aggregate that harm or damage. The most common crimes falling into this category are theft and vandalism. Until recently, the converse *Bailey* doctrine applied with full force to this category of offenses, and entitled a defendant to dismissal of all but one conviction for multiple crimes, even if each involved a complete criminal act, as long as the crimes were committed 'pursuant to a single general impulse, intention or plan.' [Citations.] This is no longer the case" after the ruling in *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*). (*Kirvin, supra,* 231 Cal.App.4th at pp. 1517—1518.)

In *Whitmer*, the defendant was a manager of a motorcycle dealership and was convicted of 20 counts of grand theft based on 20 separate fraudulent transactions. (*Whitmer, supra,* 59 Cal.4th at pp. 734—735.) *Whitmer* explained *Bailey* only concerned a single fraudulent act followed by a series of payments, it had been interpreted "more broadly than is warranted," and rejected cases which relied on *Bailey*. (*Whitmer,* at pp. 735, 740.) *Whitmer* concluded that "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (*Id.* at p. 741.) *Whitmer* affirmed the defendant's multiple

convictions for grand theft, even though the acts were part of a single plan, because he committed a series of separate and distinct fraudulent acts, and each act had a separate intent to defraud. (*Id.* at pp. 740—741.) "[A] serial thief should not receive a 'felony discount' if the thefts are separate and distinct even if they are similar." (*Id.* at pp. 740—741.) *Whitmer* declined to apply its ruling retroactively, and explained it only applied prospectively because of the long history of *Bailey*'s application. (*Whitmer,* at p. 742.)

The second category of cases that have interpreted *Bailey* "includes all of the other crimes that do not monetize and aggregate harm or damage. By and large, the converse *Bailey* doctrine has not been applied to this category of offenses; as a result, a defendant may be convicted of multiple crimes—even if the crimes are part of the same impulse, intention or plan—as long as each conviction reflects a completed criminal act. This is the rule that has been applied to convictions for insurance fraud [citation]; Medi-Cal fraud [citation]; forgery [citations]; burglary [citations]; sex crimes [citation]; corporal injury on a spouse [citation]; and identity theft [citation]. For a brief time, a handful of California courts prohibited multiple convictions for a series of related criminal acts unless they were separated by an interlude in which the defendant had a ' "reasonable opportunity to reflect upon his conduct" ' [citation], but our Supreme Court ultimately rejected that view [citations]." (*Kirvin, supra,* 231 Cal.App.4th at pp. 1518—1519.)

"The California courts have, at times, offered reasons for confining the converse *Bailey* doctrine to harm-focused crimes. Expanding the doctrine further would exacerbate two of its undesirable side effects: The doctrine effectively grants wrongdoers a 'felony discount' by assuring them only one conviction for a potentially limitless number of related offenses [citation], and it effectively displaces the legislative definitions of what constitutes a completed crime with a new constellation of judicially created 'continuous crimes' that come into being should all related burglaries, sex crimes or identity thefts be aggregated into a single 'continuous crime' [citation]. Further, a chief benefit of the converse *Bailey* doctrine—making sure defendants who engage in

conduct that technically constitutes two crimes but practically constitutes one (such as two immediately successive entries into the same home being treated as separate burglaries)—can be just as effectively achieved by the already existing rule prohibiting double *punishment*, and without all of the attendant disadvantages of prohibiting multiple *convictions*." (*Kirvin, supra,* 231 Cal.App.4th at p. 1519.)

In *Johnson, supra,* 150 Cal.App.4th 1467, the court held the defendant may be properly charged and convicted of multiple counts of spousal abuse under section 273.5, based on acts occurring during a single event, if the victim suffered multiple injuries caused by distinct applications of force. *Johnson* held the "crime described by section 273.5 is complete upon the willful and direct application of physical force upon the victim, resulting in a wound or injury. It follows that where multiple applications of physical force result in separate injuries, the perpetrator has completed multiple violations of section 273.5." (*Johnson,* at p. 1477.) *Johnson* explained why it was affirming three separate convictions for violating section 273.5, each of which concerned separate injuries sustained during the same beating on the victim, Jane Doe:

> "Defendant indisputably committed successive acts of violence against Doe [during the same beating incident]. Although Doe's testimony does not precisely describe the sequence of the beating, we do know that defendant beat her about the face and head; held her by her throat up against the wall; beat her on her back, hips, and legs; and stabbed her in the upper arm. Doe suffered two black eyes, a split lip, bruises to her neck, back, and hips and a puncture wound to her upper arm. From this evidence the jury could have concluded that defendant completed one violation of section 273.5 when he beat Doe about the head and face, blackening her eyes and splitting her lip; another when he held her by the throat and continued to strike her and restrain her such that she suffered bruises about her back and neck; and another when he injured her upper arm, drawing blood and leaving a visible scar. Accordingly, the evidence is sufficient to support the three convictions of section 273.5." (*Johnson,* at p. 1477.)

16.

### 3. Analysis

With these principles in mind, we consider whether multiple convictions of attempted murder and assault were permitted under section 954.

Both attempted murder and assault fall within the second category of cases that "includes all … crimes that do not monetize and aggregate harm or damage," where the converse *Bailey* doctrine has not been applied, so that "a defendant may be convicted of multiple crimes—even if the crimes are part of the same impulse, intention or plan—as long as each conviction reflects a completed criminal act." (*Kirvin, supra,* 231 Cal.App.4th at p. 1518.)

Castro was properly convicted of two separate charges of attempted murder and two separate charges of assault based on the unique facts here. At the outset, we note that Castro does not dispute that the acts underlying counts 3 and 5 were sufficient on their own to constitute attempted murder. Likewise, he does not dispute that the acts underlying counts 4 and 6 were insufficient alone to constitute assault. Thus, the only real question is whether Castro's actions constituted separate offenses of attempted murder and assault.

Under section 954, Castro was properly convicted of two separate counts of attempted murder and two separate counts of assault based on two separate acts. "[T]he proper analysis involves a determination of when the charged crime is completed." (*Johnson, supra,* 150 Cal.App.4th at p. 1474.) Castro committed a first act of attempted murder and assault when he aided and abetted Gonzalez's attempt to stab C. during the fight. After he completed this first murder attempt and assault, he committed a second, distinct murder attempt and assault when he took out his gun after the fight had substantially stopped and fired multiple shots at C. Since counts 3 and 4, on the one hand, and counts 5 and 6, on the other, alleged different completed acts, he was properly convicted in separate counts. *That Castro may have had the same intent and objective during both acts does not bar the multiple convictions.* (*Id.* at pp. 1473—1477.)

17.

The same reasoning applies to Castro's related argument that the two sets of dual convictions violated the federal Constitution's double jeopardy clause. As the California Supreme Court explained in *People v. Sloan* (2007) 42 Cal.4th 110, 116, " '[t]he Double Jeopardy Clause "protects against a *second prosecution* for the same offense after acquittal. It protects against a *second prosecution* for the same offense after conviction. And it protects against multiple punishments for the same offense." ' " (*Id.* at pp. 120—121.) It is implied from Castro's argument that the third protection—protecting against multiple punishments for the same offense—is implicated in his case. It is not. As we have explained, the evidence established two distinct offenses of attempted murder and assault.

The same logic also disproves Castro's related contention that he impermissibly suffered multiple convictions, based on alternative theories of criminal liability, for a single act against a single victim. He relies on *People v. Coyle* (2009) 178 Cal.App.4th 209 (*Coyle*) to make his point. But Castro's convictions are inapposite from the conclusion reached in *Coyle*. There, the defendant fired one shot that killed the victim while trying to take drugs from him. The defendant was convicted and sentenced for three counts of murder: (1) murder with the special circumstances of being committed during the commission or attempted commission of a burglary; (2) murder with the special circumstances of being committed during the commission or attempted commission of a robbery; and (3) second degree murder. (*Id.* at pp. 211, 213—214.) On appeal, the defendant argued he was improperly convicted of three separate counts of murder; the People conceded that he could be convicted of only one count under section 954, because "[t]he three counts simply alleged alternative theories of the offense." (*Coyle,* at p. 217.) As we have explained, we have very different facts here. Castro was convicted of attempted murder and assault arising out of one act of aiding and abetting an attempted murder, and separately convicted of a distinct act of attempted murder and assault on a direct perpetrator theory.

Castro's convictions on counts 3, 4, 5, and 6 were proper.[8]

## III. Section 654

In the alternative to his argument in issue II, *ante*, Castro asserts that even if he was properly convicted of two counts of attempted murder of C. (counts 3 and 5), the court improperly ordered the term imposed on count 5 to run consecutively to the term imposed on count 3. Castro argues the term of 30 years, 8 months to life imposed on count 3 should have been stayed under section 654 because the offenses were part of a single course of conduct, with a single intent and objective.[9]

### A. Section 654

"Section 954 generally permits multiple conviction. Section 654 is its counterpart concerning punishment. It prohibits multiple punishment for the same 'act or omission.' When section 954 permits multiple convictions, but section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited." (*Reed, supra,* 38 Cal.4th at p. 1227; *People v. Gonzalez* (2014) 60 Cal.4th 533, 537.)

"Section 654, subdivision (a) provides that '[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or

---

[8] Since we have disposed of this claim on the merits, we need not address Castro's argument regarding whether the claim is cognizable on appeal or his alternative argument that counsel was ineffective for failing to preserve the claim.

[9] Although Castro failed to raise a section 654 claim in the trial court, "[i]t is well settled ... that [a] court acts in 'excess of its jurisdiction' and imposes an 'unauthorized' sentence when it erroneously stays or fails to stay execution of a sentence under section 654." (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.) Accordingly, Castro is not precluded from raising a section 654 claim for the first time on appeal. (See *People v. Flowers* (1982) 132 Cal.App.3d 584, 589 ["The question of the applicability of Penal Code section 654 was not raised at the sentencing hearing, but the absence of any objection does not obviate our duty to review the section 654 question"].)

19.

omission be punished under more than one provision.' ' " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " ' [Citation.] Intent and objective are factual questions for the trial court, which must find evidence to support the existence of a separate intent and objective for each sentenced offense." (*People v. Jackson* (2016) 1 Cal.5th 269, 353—354.)

"Under section 654, 'a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]' [Citations.] This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)

In reviewing the trial court's implicit finding that Castro harbored a distinct intent and objective in committing counts 3 and 5, we determine whether there is substantial evidence to support the trial court's finding. (See *People v. Osband* (1996) 13 Cal.4th 622, 730—731.)

**B.     Analysis**

The probation report did not reference section 654 in recommending that the term imposed on count 5 run consecutively to the term imposed on count 3. In addition, neither party mentioned section 654 during the sentencing hearing with respect to whether count 5 should run consecutively to count 3. However, in imposing a consecutive term on count 5, the trial court implicitly found section 654 did not apply. (*In re L.J.* (2021) 72 Cal.App.5th 37, 43.)

The record supports the trial court's implied findings that count 3, attempted murder by shooting, was a separate act from count 5, the attempted murder by aiding and

20.

abetting Gonzalez's stabbing attempt. The stabbing attempt and the shooting were sufficiently separate in time to afford Castro the opportunity to reflect. The surveillance footage, C.'s testimony, and A.S.'s testimony show that a substantial slowdown in the fight occurred after the stabbing attempt. The footage showed the fight participants remained engaged, but some space was created between C. and his attackers, and the punching stopped. During this lull in the action, Castro could have disengaged from the fight, but he did not. He instead chose to severely escalate the seriousness of the fight by taking out his gun and shooting at C. multiple times. Substantial evidence supports the implied finding that Castro had time for reflection after the stabbing attempt, and he chose to renew his intent to murder C. and began shooting at him. Section 654 was not violated.

## IV. The gang findings

Castro claims his active gang participation conviction and his gang enhancement findings must be reversed under *People v. Valencia* (2021) 11 Cal.5th 818 (*Valencia*). The People agree, as do we.

Castro was convicted of active participation in a criminal street gang (§ 186.22, subd. (a)) and was also subjected to additional penalties and enhancements based on the jury's finding he committed the other charged offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)). To establish the Nortenos were a "criminal street gang," as required by this offense and these penalties and enhancements, the prosecution was required to prove, inter alia, that the members of that gang "collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) "A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' specified criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.' " (*People v. Loeun* (1997) 17 Cal.4th 1, 4; see also § 186.22, subd. (e).)

21.

In *Valencia*, the prosecution established the predicate offenses through the testimony of a gang expert whose "only knowledge of these offenses came from conversations with other officers and a review of police reports." (*Valencia, supra,* 11 Cal.5th at p. 827.) Our Supreme Court held this was reversible error. (*Id.* at pp. 839—840.) The court held that predicate offense evidence "constitute[s] case-specific facts that must be proved by independently admissible evidence." (*Id.* at p. 839.) "[S]uch proof may not be established solely by the testimony of an expert who has no personal knowledge of facts otherwise necessary to satisfy the prosecution's burden." (*Id.* at p. 826, citing *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).) *Valencia* disapproved of Court of Appeal decisions holding that predicate offense evidence constituted background information to which an expert properly could testify, even if derived from hearsay. (*Valencia,* at pp. 831, 835, 839, fn. 17.)

Accordingly, we reverse the conviction on count 7 and all the gang enhancement findings. Consistent with the judgment of the Court of Appeal affirmed in *Valencia,* we remand for retrial on that count and those allegations, or should the People choose not to proceed with retrial, for resentencing. (See *Valencia, supra,* 11 Cal.5th at p. 828, fn. 7.)[10]

## V.    Amendment of information

Castro contends the trial court abused its discretion by allowing the information to be amended—after the close of evidence but before closing argument—to add great bodily injury enhancements to counts 2, 3, and 4. There was no abuse of discretion.

### A.    Further background

During a discussion on the record regarding jury instructions, which took place before closing argument, the prosecutor informed the court there were "a few errors …

---

[10] Castro also argues recently enacted Assembly Bill No. 333 (2021—2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 1-5) compels reversal of the active gang participation conviction and the gang enhancements. We need not address Assembly Bill No. 333 since we are already reversing the gang conviction and enhancements.

on the information." The prosecutor said, "[F]or Count 2, the 12022.7 was inextricably [*sic*] left off of Paul Castro. We ask that that be added on." The court asked for defense counsel's comment, and counsel said, "I can see that's simply a typo." The court granted the prosecutor's request to amend the information to add the section 12022.7 allegation to conform to proof. The prosecutor then said the section 12022.7 allegation had also been omitted from the information for counts 3 and 4, and the court also allowed the amendment after defense counsel said they had no objection.

### B. Law and analysis

"An information may be amended 'for defect or insufficiency, at any stage of the proceedings,' so long as the amended information does not 'charge an offense not shown by the evidence taken at the preliminary examination.' (§ 1009.) 'If the substantial rights of the defendant would be prejudiced by the government, a reasonable postponement not longer than the ends of justice require may be granted.' [Citation.] If there is no prejudice, an amendment may be granted 'up to and including the close of the trial.' " (*People v. Goolsby* (2015) 62 Cal.4th 360, 367—368.) Trial court discretion in granting a motion to amend the information "will not be disturbed on appeal in the absence of showing a clear abuse of discretion." (*People v. George* (1980) 109 Cal.App.3d 814, 819.)

Here, Castro concedes that the great bodily injury enhancement allegations were shown by the evidence adduced at the preliminary hearing. Indeed, the evidence of great bodily injury was strong. Both C. and T. were shot twice, spent time in the hospital, and required surgeries. Both still suffer from pain and T. is 40 percent disabled.

The only genuine question is whether Castro was prejudiced by the amendment to the information after the close of evidence. Castro claims he was prejudiced because the amendment to the information to add great bodily injury enhancement allegations exposed him to increased punishment. But as the People correctly point out, Castro misconstrues the concept of prejudice applicable here. As Castro would have it, he has

been prejudiced because adding the great bodily injury enhancements to the information exposed him to a greater prison sentence. Contrarily, prejudice in this context relates to the due process requirement of fair notice to an accused so that he or she has a reasonable opportunity to prepare and present his or her defense. (*People v. Graff* (2009) 170 Cal.App.4th 345, 361—362.)

The record does not demonstrate that Castro or his trial counsel did not receive fair notice and a reasonable opportunity to prepare a defense. His counsel said the omission of the great bodily injury enhancements was "simply a typo," which suggests to us that the defense was not caught off guard by the prosecution's request to amend. Castro also does not offer anything regarding how his defense strategy would have been different had he been notified earlier of the amendments.

We also observe that the information filed in August 2016 included, as to Castro, a section 12022.53, subdivision (d), allegation and a section 12022.7, subdivision (a), allegation as to count 1 [victim T.]; and a section 12022.53, subdivision (d), enhancement allegation as to count 3 [victim C.]. Section 12022.53, subdivision (d), requires proof that a firearm discharge caused great bodily injury. Thus, great bodily injury to both C. and T. was always at issue in this trial. The amendment to the information did not bring any new issues into play. There was no abuse of discretion.[11]

## VI.     Firearm use enhancements

Castro argues the court did not understand it had discretion to impose a 20-year enhancement (§ 12022.53, subd. (c)) or a 10-year enhancement (*id.*, subd. (b)) instead of the 25-year term imposed pursuant to section 12022.53, subdivision (d). He contends his case should be remanded to the trial court to permit the trial court to exercise its discretion.

---

[11] Because we have disposed of this issue on the merits, we need not address the parties' arguments regarding whether the claim is cognizable on appeal or Castro's alternative claim of ineffective assistance of counsel.

As amended in 2018, section 12022.53, subdivision (h) affords a trial court discretion to dismiss a personal gun use enhancement. Section 12022.53, subdivision (h) provides: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."

Castro was sentenced on March 19, 2019. At that time, it was unsettled whether the power to strike or dismiss a section 12022.53, subdivision (d), enhancement includes the power to reduce the enhancement to a lesser included enhancement. The California Supreme Court recently resolved the issue in *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*). There, the high court explained the "statutory framework" of section 12022.53, as amended by Senate Bill No. 620, provides trial courts with the discretion to strike a firearm enhancement found true by the jury and to impose a lesser uncharged statutory enhancement instead. (*Tirado, supra,* 12 Cal.5th at p. 692.) Bearing in mind what we noted in footnote 5, *ante*, we see no reason why the *Tirado* holding would not apply in this case. Thus, when he is resentenced, Castro can ask the trial court to exercise its newly afforded discretion under *Tirado*.

## VII. Cumulative error

Castro contends the cumulative effect of the errors in this case deprived him of due process and a fair trial in violation of his federal and state constitutional rights. " 'Under the "cumulative error" doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial.' " (*People v. Loza* (2012) 207 Cal.App.4th 332, 365.)

We have reversed Castro's convictions on counts 1 and 7 as well as the gang enhancement findings. There is no error to accumulate with respect to Castro's other claims.

## VIII. Abstract of judgment

At sentencing, the court ordered restitution in the amount of $101,805.81 (§ 1202.4, subd. (f)). Although the court imposed the restitution amount jointly and severally on Castro and his codefendants, Castro's abstract of judgment does not so reflect. Castro correctly contends his abstract of judgment should be amended to reflect that the restitution order was imposed jointly and severally with his codefendants.

Castro is also correct that his abstract of judgment incorrectly lists only 1,599 days of pre-sentence custody credits. His actual credits for this case are 1,413 days, and his conduct credits—calculated at 15 percent of the actual days—total an additional 212 days, for a total of 1,625 days of credits at the time of his original sentencing.

We order the abstract of judgment amended to reflect that the restitution amount was jointly and severally imposed on Castro and his codefendants, and to accurately reflect his custody credits at the time of resentencing.

## IX. Remaining issues

### A. *Franklin hearing*

Castro, who was 18 years old when he committed the crimes in this case, contends he is entitled to a remand for a *Franklin*[12] hearing, at which he would be allowed to present evidence for use at future youth offender parole hearings. (See § 3051.) The People do not object. Castro may request a *Franklin* hearing on remand, and at that hearing, "the presentation of evidence shall proceed with an eye to providing a meaningful baseline of [Castro]'s characteristics and circumstances so the parole board can someday judge the extent to which he has matured and rehabilitated himself while in custody. In that regard, only such evidence as meaningfully adds to the existing record shall be permitted." (*People v. Delgado* (2022) 78 Cal.App.5th 95, 104.)

---

[12] *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

### B.    Senate Bill No. 567

Finally, Castro contends remand is required "to ensure compliance with Senate Bill 567." The Governor signed Senate Bill No. 567 (SB 567) into law, effective January 1, 2022, while this appeal was pending. SB 567, among other things, generally limits the trial court's ability to impose the upper term unless aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt by a jury or by the court in a court trial. (§ 1170, subd. (b)(1), (2), added by Stats. 2021, ch. 731, § 1.3.) Evidence of the defendant's prior convictions, in the form of certified records of conviction, is an exception to this general rule and need not be submitted to a jury. (§ 1170, subd. (b)(3), added by Stats. 2021, ch. 731, § 1.3.) "These amendments apply retroactively to [Castro] because his conviction was not final when this legislation took effect." (*People v. Flores* (2022) 75 Cal.App.5th 495, 500.)

Castro was sentenced on all seven counts he was convicted of, but the court stayed the terms imposed on counts 2, 4, 6, and 7. The court imposed the upper terms on each of those stayed counts. Castro also received the upper term of 9 years on count 1, the principal count. On remand, the trial court is required to apply section 1170 as amended.

### DISPOSITION

The convictions on counts 1 and 7 and the gang enhancement allegation findings are reversed. The prosecution may elect to retry count 7. The convictions are otherwise affirmed. However, Castro is entitled to a full resentencing on remand, where the trial court will have jurisdiction to revisit all of its sentencing choices. (*People v. Canedos*

27.

(2022) 77 Cal.App.5th 469, 481.)  On remand, Castro should also be afforded a *Franklin* hearing if he requests one.


SNAUFFER, J.

WE CONCUR:


LEVY, ACTING P. J.


DETJEN, J.